182 F.3d 113 (2nd Cir. 1999)
 YOUNG AH KIM, Plaintiff-Appellant,
v.
MARJORIE L. HURSTON, Chairperson, Temporary Release Committee, Parkside Correctional Facility of the Department of Correctional Services of the State of New York, in her individual capacity and DOLORES THORNTON, Chairperson, Temporary Release Committee, Bedford Hills Correctional Facility of the Department of Correctional Services of the State of New York, in her individual capacity, Defendants-Appellees.
 Docket No. 98-7051
August Term 1998
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Heard: October 22, 1998
Decided: June 17, 1999
 
 Appeal from the December 17, 1997, judgment of the United States District Court for the Southern District of New York (Robert L. Carter, District Judge) granting judgment as a matter of law to defendants-appellees Hurston and Thornton after a jury awarded plaintiff-appellant compensatory and punitive damages against them for denial of procedural due process in connection with revocation of temporary work release.
 Affirmed as to Thornton; reversed in part as to Hurston, and remanded with instructions to enter a judgment against her for nominal damages. [Copyrighted Material Omitted]
 Michael Yucevicius, New York, N.Y., for plaintiff-appellant.
 Rebecca Ann Durden, Asst. Atty. Gen., New York, N.Y. (Dennis C. Vacco, N.Y. State Atty. Gen., Richard J. Cardinale, Asst. Atty. Gen., New York, N.Y., on the brief), for defendants-appellees.
 Before: NEWMAN and JACOBS, Circuit Judges and TSOUCALAS,* Judge.
 JON O. NEWMAN, Circuit Judge:
 
 
 1
 This appeal primarily concerns a claimed violation of one of the most basic procedural rights -- the right to be informed of the reason for a deprivation of liberty. The claim arises in the context of an inmate's removal from a work release program. Young Ah Kim ("Kim" as she is referred to by her counsel) appeals the December 19, 1997, judgment of the United States District Court for the Southern District of New York (Robert L. Carter, District Judge), granting the motion of defendants-appellees Marjorie L. Hurston and Dolores Thornton for judgment as a matter of law after a jury verdict in Kim's favor. We conclude that the inmate had a protectable liberty interest in remaining in the work release program and that her removal, though undoubtedly justified, was accomplished without the minimal requirements of procedural due process. We also conclude, as the District Court ruled, that the evidence does not support an award of compensatory damages. We therefore reverse in part and remand with instructions to enter judgment for nominal damages as to the one defendant who is liable for the challenged action.
 
 Background
 
 2
 Kim's procedural due process claim arises in the somewhat complicated context of the jurisdictional rules that apply to the confinement of New York prisoners, their classification for mental health purposes, their eligibility for work release, and their eligibility for parole.
 
 
 3
 Kim was convicted of conspiracy in the second degree and sentenced to 18 to 54 months in New York state prison. After serving part of her sentence, she was placed in a form of work release, administered by the New York State Department of Correctional Services ("DOCS"), known as the Temporary Release Program ("TRP"). To participate in the work release program, Kim was transferred in January 1995 to the Parkside Correctional Facility ("Parkside"), a TRP facility in New York City. She progressed to the Day Reporting Center Program of the TRP, which permitted her to be released from physical confinement at Parkside and live at home while continuing to work.
 
 
 4
 To be eligible for a TRP, an inmate must have a mental health classification of at least six on the seven-level scale administered by the New York State Office of Mental Health ("OMH"). When transferred to the Parkside TRP, Kim was classified at level six, indicating that she had had some mental health treatment but needed no current monitoring.
 
 
 5
 In February 1995, Kim underwent a random urinalysis test, required of all work release program participants. A few days later, when the urinalysis indicated the presence of opiates, Kim was confined to the Parkside facility, and her participation in work release ended. She testified that this occurred on March 3 or 4. Kim insisted that she had not taken drugs and became very upset at the accusation implied by the lab report. She locked herself in a bathroom and refused to eat or drink, contending that possibly something had been placed in her food that contaminated the urinalysis test result. She made statements that could be construed as suicidal and threatening harm to other persons. The DOCS officials at Parkside became concerned and called in an OMH psychologist who examined Kim that day. The psychologist concluded that Kim was a threat to herself and others, diagnosing her as having an "[a]djustment disorder with depressed mood." He downgraded her mental health level to two. With this change, Kim was no longer eligible for work release and, under DOCS regulations, had to be transferred to a facility providing level two care.
 
 
 6
 Within a few days after her reconfinement at Parkside, Kim was transferred to Bedford Hills Correctional Facility ("Bedford Hills"), which provides mental health care for those classified in levels two or one. At intake there, she was downgraded from level two to level one after telling the OMH psychiatric nurse in charge that she wanted to die if she could not prove that she had not taken drugs and that the results of the urinalysis were incorrect. The OMH personnel believed that Kim's distress derived solely from the pending disciplinary process relating to the drug test. Eventually, the misconduct proceeding triggered by the positive drug test was dismissed as untimely. There is no evidence that Kim was ever informed of this development.
 
 
 7
 At the time of her transfer to Bedford Hills in March, Kim had been scheduled to appear before the April meeting of the parole board. However, because she was still technically under the jurisdiction of Parkside, she could not appear before the parole board at Bedford Hills.[1] Because of internal rules of DOCS and the Division of Parole, Kim had to be "assigned" from Parkside to Bedford Hills in order to appear before its Parole Board.
 
 
 8
 To accomplish this reassignment and to allow Kim to apply for parole, the Temporary Release Committee ("TRC") at Parkside held a hearing on April 10, 1995, to remove Kim from the jurisdiction of the Parkside TRP. The Committee voted to remove Kim from the Parkside TRP because she was "medically unsuitable." Kim did not receive notice of the hearing, was not present at it, and received no statement of the reason for her removal. Both sides agree that Kim did not know she had been jurisdictionally removed from the Parkside TRP on April 10; she had already been physically confined at Bedford Hills for a month.
 
 
 9
 In May 1995, Kim's mental health status was upgraded to level six. She then applied for and was granted reinstatement to a TRP, and was transferred back to Parkside in June.
 
 
 10
 In March 1996, Kim filed the present lawsuit against several DOCS personnel, including defendants-appellees Hurston and Thornton. Hurston, at the relevant times, was chairperson of the TRC at Parkside, and Thornton held that position at Bedford Hills. Kim contended that the defendants deprived her of a liberty interest in continued participation in work release without procedural due process when they removed her from the Parkside TRP without at least twenty-four hours notice of the removal hearing and a statement of the reason for the removal.
 
 
 11
 The jury returned a verdict in favor of Kim on her claims against Hurston and Thornton, and in favor of all of the remaining defendants who had not been previously dismissed. The jury awarded compensatory damages of $2,750, and punitive damages of $2,000 each against Hurston and Thornton.
 
 
 12
 After the jury was excused, Judge Carter granted the renewed motions of Hurston and Thornton for judgment as a matter of law. He noted that "there is really no evidence that [Kim] even knew that she had been removed" from the work release program. He also noted that "there is no evidence that she had any trauma based upon the fact that she was removed and had no notice."
 
 Discussion
 
 13
 A district court's determination of a Rule 50 motion for judgment as a matter of law is reviewed de novo. See Vermont Plastics, Inc. v. Brine, Inc., 79 F.3d 272, 277 (2d Cir. 1996); In re Joint Eastern & Southern District Asbestos Litigation, 52 F.3d 1124, 1131 (2d Cir. 1995). We are required to apply the same standard that a district court must use: a Rule 50 motion may be granted only "when `drawing all reasonable inferences regarding the weight of the evidence and the credibility of witnesses in favor of [the non-movant], a reasonable jury could only have found for the [movant].'" Vermont Plastics, 79 F.3d at 277 (quoting Asbestos, 52 F.3d at 1131).
 
 I. Liberty Interest in Work Release
 
 14
 Kim's procedural due process claim turns initially on the existence of a liberty interest protected by the Fourteenth Amendment. This Court has held that a prisoner has a protected liberty interest in continuing in a work release program. See Tracy v. Salamack, 572 F.2d 393, 395-96 (2d Cir. 1978); see also Severino v. Negron, 996 F.2d 1439, 1441 (2d Cir. 1993). Tracy grounded the liberty interest partly on a loss of liberty described as "grievous,"[2] 572 F.2d at 395, and partly on the narrow bounds of discretion that state law established for exercising discretion to grant admission to a work release program, see id. n.9. To the extent that the decision rested on the latter ground, it was placed in some doubt by the Supreme Court's decision in Sandin v. Conner, 515 U.S. 472 (1995). In Sandin, the Court abandoned reliance on the extent to which state regulations narrowed prison officials' discretion as a test for a prisoner's protected liberty interest, see id. at 483-84, and framed the test solely in terms of whether the deprivation "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," id. at 484.
 
 
 15
 Since Sandin, the district courts in New York have disagreed on whether an inmate has a liberty interest in continued participation in work release. Compare Greaves v. New York, 951 F. Supp. 33, 35 (S.D.N.Y. 1996) (upholding liberty interest); Roucchio v. Coughlin, 923 F. Supp. 360, 374 (E.D.N.Y. 1996) (same); Quartararo v. Catterson, 917 F. Supp. 919, 940 (E.D.N.Y. 1996) (same); Hollingsworth v. Robinson, 901 F. Supp. 565 (E.D.N.Y. 1995) (assuming same), with Tillotson v. Callender, 94-CV-2574, 1998 WL 136570, at *5 (E.D.N.Y. Mar. 20, 1998) (implying no liberty interest); Dudley v. Coombe, 96 Civ. 1665, 1997 WL 423074, at *3 (S.D.N.Y. July 28, 1997) (rejecting liberty interest). See also Dominique v. Weld, 73 F.3d 1156, 1160 (1st Cir. 1996) (rejecting liberty interest).
 
 
 16
 Recently, the Supreme Court shed considerable light on the issue, holding in Young v. Harper, 520 U.S. 143, 152-53 (1997), that an Oklahoma "preparole conditional supervision program" was sufficiently like parole to invoke the procedural protections outlined in Morrissey v. Brewer, 408 U.S. 471 (1972). The work release program in which Kim participated, at least the final phase in which she lived at home and worked at a job, while regularly reporting to Parkside, is virtually indistinguishable from either traditional parole or the Oklahoma program considered in Young. While participating in this phase of the TRP, Kim enjoyed a liberty interest, the loss of which imposed a sufficiently "serious hardship" to require compliance with at least minimal procedural due process. See Pena v. Recore, No. 95-CV-5307, 1997 WL 581058, at *5-*8 (E.D.N.Y. Sept. 16, 1997) (denying motion to dismiss complaint by prisoner removed from TRP).
 
 
 17
 II. Existence of Procedural Due Process Violation
 
 
 18
 If, as we have ruled, a protected liberty interest exists, the Appellees do not dispute that procedural due process required notice of removal from the TRP and a statement of the reasons for the removal.[3] Nevertheless, we need to consider the matter further because the nature of the due process violation has a bearing on the parties' claims concerning both liability and damages.
 
 
 19
 Unfortunately, the case was tried on a somewhat confused theory of liability. The confusion arose from a failure to distinguish the physical removal of Kim from the TRP and the formal jurisdictional removal. According to Kim's testimony, the physical removal occurred on March 3 or 4 when the drug test showed a positive result for opiates.[4] At that time, her freedom to live at home while working ended, and she was physically confined to the Parkside facility. The formal jurisdictional removal did not occur until April 10 when the Parkside TRC held a hearing and ordered Kim removed from the TRP.
 
 
 20
 At trial, Kim's counsel, in summation, embraced both theories of "removal" from the TRP. First, he told the jury that the case was about "telling somebody before you put them in prison, giving them notice that you are going to do that and telling them why." That seems to refer to the physical removal from work release and confinement at Parkside that occurred in early March. Later, he argued that the defendants "concede Ms. Kim was never given notice of the hearing by which she was to be removed from the temporary release program. ... That's the violation, ladies and gentlemen. That's the case." The reference to the "hearing" refers to the jurisdictional removal from the TRP that occurred on April 10, when the Parkside TRC considered Kim's case. Counsel's summation also urged the jury to award damages for the entire period from early March until she was paroled in late May.
 
 
 21
 The Court's charge, in characterizing Kim's claim, referred generally to her "removal" from the TRP, without distinguishing between physical and jurisdictional removal. The special verdict form, on which the jurors indicated their liability finding, also referred generally to "removal."
 
 
 22
 The distinction between physical and jurisdictional removal bears on the issue of liability because of the change that occurred in the reason for removal. Since the physical removal was prompted by the report of the urinalysis, there was no opportunity for prior notice. Kim had no procedural due process right to prior notice of the physical removal, since that removal occurred in the context of an emergency. The Parkside personnel were entitled to end her physical freedom immediately upon learning the urinalysis result. Nevertheless, though the emergency justified the immediate physical removal, Kim was entitled thereafter to a hearing to dispute the ground that was alleged to exist for that removal and to know the reason for it. That hearing occurred on April 10, and, whether or not Kim might have contended that procedural due process required a more prompt hearing, she made no claim to the jury that the hearing was unduly delayed.
 
 
 23
 The situation with respect to being informed of the reason is more complicated. On the day she was physically removed from the TRP, the evidence is undisputed that she knew the reason, the drug test result, and knew it promptly. Indeed, it was this knowledge that caused her to be so upset that she exhibited the symptoms that led to the downgrade in her mental health classification. However, at some point, the reason for her confinement changed from the urinalysis report to her mental health classification. The latter reason is the one that resulted in her transfer to Bedford Hills, the only women's facility that could accommodate an inmate in mental health classification one or two. And the evidence is undisputed that when the Parkside TRC accomplished her jurisdictional removal from the TRP on April 10, they acted entirely on the basis of her mental health classification. Thus, whether or not some liability existed for not telling Kim prior to April 10 the changed reason for her removal from the TRP, liability plainly existed as of April 10.
 
 
 24
 When procedural due process requires an explanation of the ground for termination of a liberty interest, it requires a statement of the actual ground, and if an initial ground is changed, the person deprived of liberty is entitled to know the new ground. The Appellees do not dispute that Kim was entitled to notice of the April 10 hearing that formally removed her from the TRP and to a statement of reasons for that removal.
 
 
 25
 This case is unusual in that the minimal hearing that procedural due process requires would have done Kim little good since she could not have realistically contested the changed reason, mental health classification, that resulted in her jurisdictional removal from the TRP. Nevertheless, the procedural due process requirement of a statement of reasons must be observed.
 
 
 26
 Liability thus exists for the lack of notice of the April 10 hearing and the failure to inform Kim of the correct reason for the removal from the TRP.
 
 III. Defendants' Liability
 
 27
 The jury found two defendants liable for the procedural due process violation, Appellees Hurston and Thornton, the chairpersons of the TRCs at Parkside and Bedford Hills. As chairperson of the TRC that held the April 10 hearing, Hurston was properly found liable for not giving Kim notice of that hearing and the reason for the outcome.[5] Thornton's situation is different. She testified that she was unaware of the April 10 hearing, and Hurston testified that she did not inform Thornton of the hearing. Though DOCS regulations impose an obligation on the chairperson of the transferee TRC to inform a transferred inmate of a hearing at the original facility, that regulation assumes knowledge by the chairperson of the transferee TRC. Lacking such knowledge, Thornton incurred no liability for Hurston's procedural due process violation.
 
 IV. Qualified Immunity
 
 28
 We next consider whether Hurston's liability is extinguished by the defense of qualified immunity. Unless there are historical facts in dispute that relate to such immunity, the defense is an issue of law for the Court. See Hunter v. Bryant, 502 U.S. 224, 227-28 (1991); Tierney v. Davidson, 133 F.3d 189, 194 (2d Cir. 1998); Lennon v. Miller, 66 F.3d 416, 422 (2d Cir. 1995). Qualified immunity shields government officials from liability for damages on account of their performance of discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).
 
 
 29
 At the time of the April 10 hearing, it was clearly established in New York that an inmate on work release had a legally protectable interest in remaining on such release, see Tracy, 572 F.2d at 395-96, and the minimal procedural due process requirements of notice and reasons for terminating a protected liberty interest have long been established. See Wolff v. McDonnell, 418 U.S. 539, 563-65 (1974); Morrissey, 408 U.S. at 485-89. The Appellees contend that the clarity of the protected liberty interest was placed in doubt by our decision upholding a qualified immunity defense to removal from work release in Severino, 996 F.2d at 1442. We disagree. Severino, involving a TRP revocation of an alien who was subject to a late filed Immigration and Naturalization Service detainer, rested on the confusion between grounds for eligibility for the TRP, which would have been precluded by a timely detainer, see N.Y. Comp. Codes R. & Regs. tit. 7, §1900.4(c)(4)(i)(g), and grounds for revocation of the TRP, which omitted the detainer as a specific ground and included only more general grounds, see id. §1904.1; Severino, 996 F.2d at 1440-41.[6]
 
 
 30
 The Appellees also contend that it was objectively reasonable for Kim to be denied notice of the reason for removal from the TRP because prison officials could reasonably believe that informing her of the reason might upset her, in light of her mental health status. As a factual matter, this claim is somewhat ironic since Kim claims to have been upset because she did not know the true reason for her removal. In any event, this theory of objective reasonableness is defeated as a matter of law with respect to Hurston because she testified that she had no contact with mental health officials at Bedford Hills from March 9, when Kim was transferred there, through the April 10 hearing, and, lacking current information, therefore had no objectively reasonable basis for thinking that Kim's mental state would have been disturbed by compliance with procedural due process requirements.[7]
 
 V. Damages
 
 31
 The jury awarded $2,750 in compensatory damages, and $2,000 against each defendant as punitive damages. The District Judge disallowed any damage recovery on the grounds that no evidence showed that Kim's emotional distress was caused by lack of notice of the reason for removal from the TRP and that she was unaware of the April 10 hearing and the reason for the removal.
 
 
 32
 Clearly, the punitive damages award may not stand. There is no evidence of the sort of egregious behavior that would warrant such damages. The compensatory award presents a somewhat closer question. Though neither Hurston nor anyone else ever told Kim the reason that she was jurisdictionally removed from the TRP, several witnesses testified that Kim was told that she would be transferred to Bedford Hills because of her mental health status. One of Kim's witnesses, an OMH nurse, testified that she explained Kim's mental health situation to her after her arrival at Bedford Hills. Kim's damage theory is that she suffered emotional distress by not knowing the reason for the jurisdictional removal from the TRP. Yet, the evidence is clear that she knew she had been physically removed from the TRP because of the dirty urine, and as Judge Carter pointed out, she could not have been distressed by not knowing the reason for the jurisdictional removal because she was not informed of that proceeding at all, which was conducted for the benign purpose of rendering her eligible for parole while confined at Bedford Hills. Moreover, her mental health status, which was the reason, was a circumstance that several people at Parkside had discussed with her, even though they apparently did not explicitly link this circumstance to the subsequent jurisdictional removal from the TRP. Nor, as we have pointed out, did she suffer compensable damage from lack of notice of the jurisdictional removal because she had no basis for contesting it. In sum, the denial of procedural due process in this case was a technical violation that resulted in no compensable damages. The appropriate remedy is an award of only nominal damages.
 
 Conclusion
 
 33
 As to defendant-appellee Thornton, the judgment is affirmed; as to defendant-appellee Hurston, the judgment is reversed in part, and the case is remanded for entry of an award of nominal damages against her. The appellant may recover her taxable costs.
 
 
 
 NOTES:
 
 
 *
 Honorable Nicholas Tsoucalas, of the United States Court of International Trade, sitting by designation.
 
 
 [1]
 As Defendant-Appellee Thornton put it, Kim was physically at Bedford Hills but still "owned" by Parkside. "That means that . . . whatever occurs with her, Parkside is responsible for her." Thornton also explained that the term "owned" is used in this context throughout the DOCS.
 
 
 [2]
 The label had been applied by the District Court, see Tracy v. Salamack, 440 F. Supp. 930, 933-34, 936 (S.D.N.Y. 1977), and this Court expressed agreement, see 572 F.2d at 396.
 
 
 [3]
 The Appellees contend that Kim's section 1983 suit is barred by Heck v. Humphrey, 512 U.S. 477 (1994), and Edwards v. Balisok, 520 U.S. 641, 648 (1997), but we have recently ruled that Heck and Balisok do not bar a section 1983 suit complaining of conditions of confinement where the prisoner is not challenging the overall length of confinement. See Jenkins v. Haubert, No. 98-2408, 1999 WL 382675, *9 (2d Cir. May 26, 1999).
 
 
 [4]
 The date might have been March 8, which is the date Kim's counsel, in summation, asked the jury to start the period for awarding damages. The discrepancy between March 3 and March 8 has no bearing on our Disposition.
 
 
 [5]
 We need not decide whether Kim, then confined at Bedford Hills, had a right to attend the hearing at Parkside, since she makes no claim in this regard.
 
 
 [6]
 To whatever extent the clarity of the protected liberty interest might have been placed in doubt temporarily by Sandin, until the Supreme Court's later decision in Young, such doubt would not help the Appellees' qualified immunity defense because Sandin was not decided until June 19, 1995, after the April 10 hearing.
 
 
 [7]
 Even if a person's mental state might defeat liability for not providing her with notice of the reason for the deprivation of a protected liberty interest, which we do not decide, a corollary of any such theory would likely be a requirement to attempt to provide such notice to a responsible relative.