896 A.2d 473 (2006)
385 N.J. Super. 117
Ali SHABAZZ # 210143, Appellant,
v.
NEW JERSEY DEPARTMENT OF CORRECTIONS, Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted March 8, 2006.
Decided April 10, 2006.
*474 Ali Shabazz, appellant pro se.
Zulima V. Farber, Attorney General of New Jersey, attorney for respondent (Patrick DeAlmeida, Assistant Attorney General, and Jean Reilly, Deputy Attorney General, of counsel; Thomas E. Kemble, Deputy Attorney General, on the brief).
Before Judges STERN, FALL and YANNOTTI.
The opinion of the court was delivered by
YANNOTTI, J.A.D.
Ali Shabazz (Shabazz) is an inmate in the State's correctional system. Shabazz was placed in a halfway house and while there Shabazz was charged with a disciplinary infraction. Shabazz was returned to prison and thereafter found guilty of using abusive or obscene language to a staff member. Shabazz filed a notice of appeal from that determination and, while the appeal was pending, the Department of Corrections (Department) reconsidered its decision and found that he was not guilty of the charge. However, Shabazz was not returned to the halfway house. He argues that he has a liberty interest in remaining in the halfway house that is protected by the Due Process Clause. We disagree and therefore dismiss the appeal.
We briefly summarize the relevant facts. Shabazz is presently an inmate at a State correctional facility. He is serving a custodial *475 sentence after having been convicted of aggravated assault, unlawful possession of weapons, possession of controlled dangerous substances and receipt of stolen property. At some point during his incarceration, Shabazz was re-assigned to Tremont House, a halfway house facility.
On August 26, 2004, Linda Fulcher (Fulcher), Shabazz's ex-girlfriend, contacted the Tremont House Service Director Qiyyim Abdul Jabbar (Jabbar) and informed him that Shabazz left threatening messages on her answering machine. An investigation followed immediately. Jabbar listened to Fulcher's recorded messages and identified Shabazz's voice. Shabazz was informed of his use immunity rights but he elected not to make a statement at the time. Shabazz was charged with threatening another with bodily harm, which is a prohibited act *.005. See N.J.A.C. 10A:9-2.11(c)(2). Because he was charged with a "major disciplinary violation," Shabazz was returned to prison. N.J.A.C. 10A:20-4.19(d). On August 27, 2004, Shabazz was transferred to the Central Reception and Assignment Facility and later incarcerated at Northern State Prison.
Hearing officer Don Wiater conducted a hearing on the charge on September 8, 2004. Shabazz pled not guilty. Shabazz was informed again of his use immunity rights. Shabazz requested a counsel substitute and one was provided. At the hearing, counsel substitute asserted that Fulcher accused him of making threats because she believed that Shabazz had "neglected" her. Fulcher submitted a letter dated September 1, 2004, in which she stated that her allegations were a lie. Fulcher said:
I was very angry with [Shabazz] for messing around. It is not easy letting go of a twenty year relationship. I am very sorry for what I have caused. If there is anything else that you need or that I need to do, please let me know. Again I am truly sorry.
The hearing officer modified the charge to prohibited act .304, using abusive or obscene language to a staff member. See N.J.A.C. 10A:9-2.11(d)(23). In the adjudication report, the hearing officer noted that, once Fulcher realized that Shabazz could be returned to prison from the halfway house, Fulcher recanted but the hearing officer found that the charge had been proven because Shabazz left a message with abusive language on Fulcher's answering machine. The hearing officer imposed ten days of detention and 60 days loss of commutation time but suspended the latter sanction.
On September 8, 2004, Shabazz filed an administrative appeal. Shabazz denied that he threatened anyone. He asserted that the incident occurred because he was breaking off his relationship with Fulcher. Shabazz noted that the charge had been downgraded to using "bad language" with a staff member but Shabazz stated that Fulcher was not a staff member. Moreover, Shabazz asserted that Fulcher fabricated the story "because she was hurt knowing that I would not take her back." Shabazz said that Fulcher admitted to lying and fabrication. He asked that all charges be dismissed.
On September 8, 2004, the Assistant Superintendent upheld the hearing officer's finding that Shabazz had committed prohibited act .304. He refused to dismiss the charges but modified the hearing officer's decision by reducing the sanctions to 5 days detention and 60 days loss of credit time, with the latter sanction suspended.
Shabazz filed an appeal to this court on November 4, 2004. On February 9, 2005, Gary J. Sheperd, Chief Hearing Officer, advised Shabazz that he had decided to order a rehearing of the charge. The *476 hearing was held on March 16, 2005 and Shabazz was found not guilty.
In this appeal, Shabazz argues that he was denied due process in the disciplinary proceeding. Shabazz contends that the hearing officer abused his authority and violated his right to due process when he modified the charge from *.005 to .304. Shabazz additionally asserts that the hearing officer erred by finding him guilty on the charge because he made no threat and did not use abusive language to a staff member. Shabazz contends that the hearing officer's finding of guilt was a foregone conclusion and the administrative appeal process was little more than a "rubber stamp."
The State contends that Shabazz's appeal from the decision finding him guilty of using abusive or obscene language to a staff member is moot. We agree. "A case is moot if the disputed issue was resolved, at least with respect to the parties who instituted the litigation." Advance Electric Co., Inc. v. Montgomery Tp., 351 N.J.Super. 160, 166, 797 A.2d 216 (App.Div.), certif. denied, 174 N.J. 364, 807 A.2d 195 (2002)(citing DeVesa v. Dorsey, 134 N.J. 420, 428, 634 A.2d 493 (1993)(Handler, J., concurring) and Oxfeld v. New Jersey State Board of Educ., 68 N.J. 301, 303-04, 344 A.2d 769 (1975)). Because Shabazz was found not guilty, the sanctions have been set aside and the charge expunged. N.J.A.C. 10A:4-11.8; N.J.A.C. 10A:4-9.26(b). Clearly, the dispute between Shabazz and the Department in respect of the finding of guilt and the imposition of sanctions has been resolved.
However, as we stated previously, because he was charged with a "major disciplinary violation," Shabazz was removed from the halfway house and returned to prison. N.J.A.C. 10A:20-4.19(d). Shabazz asserts that his custody status was thereafter changed from "full minimum" to "gang minimum."[1] Shabazz was no longer eligible for halfway house placement. N.J.A.C. 10A:20-4.4(a)(requiring "full minimum" status for participation in "residential community programs"). Consequently, Shabazz contends he was unable to earn certain "good time" credits, could not continue working at his job and was "dropped" from Essex County College where he had been enrolled. In our view, these collateral consequences are sufficient to raise a justiciable controversy as to whether Shabazz has a liberty interest in continuing his halfway house placement notwithstanding the Department's finding that he was not guilty of the disciplinary charge. See Cinque v. Dept. of Corrections, 261 N.J.Super. 242, 244, 618 A.2d 868 (App.Div.1993)(noting that an appeal will not be mooted by subsequent administrative action if the inmate is subject to "substantial collateral consequences").
We turn then to Shabazz's contention that he has a liberty interest in continued placement at the halfway house that is protected by the Due Process Clause. Shabazz seeks an order mandating his immediate return to the halfway house, restoration of his "good time" credits "at the same rate in which they were being accrued," and an award of $14,300 for lost wages, less adjustments for "board." We are convinced that these contentions are without merit.
*477 In Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Court held that an inmate's placement in disciplinary segregation did not create a liberty interest protected by the Due Process Clause. The Court explained that due process safeguards are only required when a change in an inmate's custody status "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484, 115 S.Ct. at 2300, 132 L.Ed.2d at 430.
In Sandin, due process protections were not required because disciplinary confinement was not an "atypical, significant deprivation." Id. at 486, 115 S.Ct. at 2301, 132 L.Ed.2d at 431. A comparison of the conditions in and out of disciplinary segregation indicated that placement of the inmate in disciplinary segregation for thirty days "did not work a major disruption" in the inmate's prison environment. Ibid.
We applied the Sandin test in Moore v. Department of Corrections, 335 N.J.Super. 103, 761 A.2d 107 (App.Div.2000), where the inmate's "minimum custody status" was revoked because he failed to participate in a substance abuse program. Id. at 105, 761 A.2d 107. We held that the change in custody status did not require due process safeguards. We concluded that the change did not represent an "atypical and significant hardship" upon the inmate when considered in relation to "the ordinary incidents of prison life." Id. at 109, 761 A.2d 107 (quoting from Sandin, supra, 515 U.S. at 484, 115 S.Ct. at 2300, 132 L.Ed.2d at 430). We stated, "There is no constitutionally protected interest in reduced custody status." Id. at 110, 761 A.2d 107.
We also applied the Sandin test in Muhammad v. Balicki, 327 N.J.Super. 369, 743 A.2d 376 (App.Div.2000). In that case, the inmate had been given reduced custody status which allowed him to enjoy "more mobility and less supervision in the prison than the general prison population." Id. at 371, 743 A.2d 376. The Department later adopted a new regulation under which the inmate was no longer eligible for reduced custody status. We held that the inmate's return to more restrictive custody did not impose an "atypical and significant hardship on the inmate" and, therefore, under Sandin, the inmate had no liberty interest in reduced custody status. Id. at 372, 743 A.2d 376. See also Szemple v. Dept. of Corrections, 384 N.J.Super. 245, 894 A.2d 698 (App.Div.2006) (concluding that there is no protected liberty interest in designation of inmate as "high risk"); White v. Fauver, 219 N.J.Super. 170, 530 A.2d 37 (App.Div.1987)(holding that there is no constitutionally protected liberty interest in reduced custody status).
We have recognized that "halfway house placement does not involve a liberty interest giving rise to due process rights." Trantino v. N.J. State Parole Bd., 296 N.J.Super. 437, 464, 687 A.2d 274 (App. Div.1997), modified in part on other grounds and affirmed, 154 N.J. 19, 711 A.2d 260 (1998). Shabazz therefore did not have a constitutionally protected interest in his initial placement at Tremont House. He similarly had no constitutionally protected liberty interest in remaining there.
Under the Department's regulations, inmates must meet certain eligibility criteria in order to participate in a Residential Community Release Agreement Program (RCRAP). N.J.A.C. 10A:20-4.4. A "halfway house" is a RCRAP "with specific emphasis on employment and educational activities in the context of treatment and rehabilitation." N.J.A.C. 10A:20-1.3.
To qualify for admission to a RCRAP, the inmate must be classified by the ICC *478 as "full minimum". N.J.A.C. 10A:20-4.4 (a)(1). The inmate must have a psychological evaluation which addresses "the inmate's readiness and ability to adequately adapt to the pressures and responsibilities of living outside the correctional facility." N.J.A.C. 10A:20-4.4(a)(2). The inmate also must have a satisfactory "overall correctional facility adjustment and be seen as not likely to pose a threat to the safety of the community." N.J.A.C. 10A:20-4.4(a)(5). In addition, a candidate for halfway house placement must be within 18 months of (1) an established parole date, (2) expiration of the maximum sentence, (3) an actual parole eligibility date or (4) an anticipated parole date. N.J.A.C. 10A:20-4.5.
Inmates in a halfway house are subject to significant restrictions on their liberty. They may be tested for prohibited substances. N.J.A.C. 10A:20-4.20(a). The program must evaluate and approve or disapprove all prospective places of employment. N.J.A.C. 10A:20-4.27. The program monitors all employment and education sites. N.J.A.C. 10A:20-4.29. The inmates may not leave the program without the authorization of the program director or the director's designee. N.J.A.C. 10A:20-4.37(a). Overnight furloughs are strictly regulated and in some instances not allowed at all. N.J.A.C. 10A:20-4.35; N.J.A.C. 10A:20-4.36. The inmates also are subject to disciplinary sanctions for: violations of the law, engaging in sexual acts on the program's premises, traveling outside of New Jersey, using or possessing alcohol and/or controlled dangerous substances and certain prohibited acts. See N.J.A.C. 10A:20-4.19(d)(1) to -(7).
The nature and extent of these restrictions establish that inmates in a halfway house setting remain in institutional confinement. The return of an inmate from a halfway house to a prison therefore does not impose an "atypical" or "significant" hardship on the inmate. Sandin, supra, 515 U.S. at 484, 115 S.Ct. at 2300, 132 L.Ed.2d at 430. Moreover, an inmate does not have a protected liberty interest in serving his or her sentence in a particular correctional facility. See Meachum v. Fano, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451, 459 (1976).
In Asquith v. Department of Corrections, 186 F.3d 407 (3d Cir.1999), the court addressed the question of whether a New Jersey inmate had a liberty interest in remaining in a halfway house that is protected by the Due Process Clause. The Asquith case presented a factual scenario that is substantially the same as is presented in this matter.
Asquith was serving a five-year sentence and had been placed in a halfway house operated by the Volunteers of America (VOA). A case aide reported that Asquith smelled of alcohol and he failed a Breathalyzer test. Because he was charged with a major violation, Asquith was immediately returned to prison but, after a hearing, he was found not guilty of the charge. Asquith remained in prison and the Department did not provide Asquith with a hearing on the issue of whether he should be returned to the halfway house. Id. at 409.
The Third Circuit noted that inmates who are paroled have protected liberty interests after their release from institutional confinement. Id. at 410 (citing Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). The Asquith court also noted that in Young v. Harper, 520 U.S. 143, 117 S.Ct. 1148, 137 L.Ed.2d 270 (1997), the Court found that an inmate released pursuant to Oklahoma's Pre-parole Conditional Supervision Program "had a protected liberty interest entitling him to due process before he could be removed from the program." Ibid.
*479 However, unlike the parolee in Morrissey and the inmate in the Young case who was released on pre-parole, Asquith "never left institutional confinement." Id. at 411. The Court stated:
While at the facility, [Asquith] was subject to a curfew and had to "stand count" several times a day. He was also required to submit to urine monitoring and his room could be searched. Asquith could leave the house, but had to sign in and out, and his weekend passes were limited to two nights every seven days. VOA would monitor the time it took Asquith to travel to and from the halfway house, and he was required to take public transportation. While away, he was required to check in by phone several times each day. If he could not be contacted within two hours, he would be deemed an escapee.
[Ibid.]
The Third Circuit found that "[t]hese restrictions are dispositive because they amount to institutional confinement." Ibid. (citing Brennan v. Cunningham, 813 F.2d 1, 5-6 (1st Cir.1987)).
The court in Asquith also pointed out that New Jersey's community release program was different from parole release because there was no implicit promise that halfway house status would only be revoked if the inmate failed to meet certain conditions. Ibid. The court noted that, under the Department's regulations, an inmate who is merely charged with a major violation will be returned to a correctional facility. Ibid. (citing N.J.A.C. 10A:20-4.21). In addition, the Commissioner of Corrections is authorized "at any time [to] transfer an inmate from one place of confinement to another." Ibid. (quoting from N.J.A.C. 10A:20-4.2). "Thus, Asquith's continued participation [in the community release program] was dependent upon extrinsic events, and he could have no expectation that he would remain in the program once charged with a major violation." Ibid.
We agree with the Third Circuit's analysis. We similarly conclude that Shabazz did not have a protected liberty interest in continued placement in the halfway house. His return to the correctional facility did not impose upon him any "atypical and significant hardship," when weighed against the "ordinary incidents of prison life." Sandin, supra, 515 U.S. at 484, 115 S.Ct. at 2300, 132 L.Ed.2d at 430. We therefore are satisfied that Shabazz was not entitled to a hearing to determine whether he should be returned to prison from the halfway house.
In support of his appeal, Shabazz relies upon the Second Circuit's decision in Kim v. Hurston, 182 F.3d 113 (2d Cir.1999). There, the inmate was placed in a New York work release program, which permitted her to live at home while working at a job but required that she report regularly to a correctional facility. Id. at 115. The court held that the work release program was "virtually indistinguishable" from traditional parole or the pre-parole program considered in Young, supra, 520 U.S. at 152-53, 117 S.Ct. at 1154, 137 L.Ed.2d at 279-80. Id. at 118. Therefore, the court found that the inmate had a liberty interest which could not be deprived without minimal due process protections. Ibid. However, in this case, Shabazz was not permitted to live at home and he was subject to a variety of significant restrictions on his liberty which amount to institutional confinement. Thus, Shabazz's reliance upon Kim v. Hurston is misplaced.
Shabazz also relies upon Tracy v. Salamack, 572 F.2d 393 (2d Cir.1978). In that case, certain inmates were allowed to participate in a temporary release program as permitted by a New York statute. However, the statute was amended and new *480 eligibility requirements established for the program. The state correctional officials applied the new criteria and the ineligible inmates were returned to a correctional facility. Id. at 394. The Second Circuit held that the inmates had a liberty interest in continuing in the program and the Due Process Clause protected them "against removal from the program without a prior hearing." Id. at 395. The court concluded that each inmate was entitled to a re-evaluation of the inmate's eligibility under the new statutory criteria, after a due process hearing. Id. at 396. The Tracy case also is distinguishable. Here, Shabazz was not removed from the halfway house because of any change in the program's eligibility criteria. Furthermore, as the Third Circuit noted in Asquith, under New Jersey's regulatory scheme, inmates placed in a halfway house have no expectation that they will remain there, even if they are charged and found not guilty of a major violation. Asquith, supra, 186 F.3d at 411.
Shabazz also seeks restoration of certain "good time" credits and an award of wages that he might have earned while placed in the halfway house.
Inmates may be awarded commutation credit for "continuous orderly deportment" while incarcerated. N.J.S.A. 30:4-140; N.J.A.C. 10A:9-5.1(a). Inmates also may be awarded credit for employment in certain "productive occupations." N.J.S.A. 30:4-92; N.J.A.C. 10A:9-5.1(b)(1). In addition, inmates in minimum custody or community custody status who are employed receive further remission of time from their sentences. N.J.S.A. 30:4-92; N.J.A.C. 10A:9-5.1(b)(3).
Because Shabazz was found not guilty of the charge following the re-hearing, any loss of commutation time that had been previously imposed for that charge has been expunged. N.J.A.C. 10A:4-11.8; N.J.A.C. 10A:4-9.26(b). Furthermore, Shabazz is not entitled to any credit or wages that he might have earned for employment while placed in a halfway house. Inmates do not have a "liberty interest in a particular, or any, job assignment, nor in the wages or credits that can be earned by performing a prison work assignment." Lorusso v. Pinchak, 305 N.J.Super. 117, 119, 701 A.2d 974 (App.Div.1997), certif. denied, 153 N.J. 403, 709 A.2d 797 (1998)(citing James v. Quinlan, 866 F.2d 627, 629 (3d Cir.), cert. denied, 493 U.S. 870, 110 S.Ct. 197, 107 L.Ed.2d 151 (1989)).
Appeal dismissed.
NOTES
[1] There are six categories of custody status within the Department: 1) close custody, 2) maximum custody, 3) medium custody, 4) gang minimum custody, 5) full minimum custody and 6) community custody. N.J.A.C. 10A:9-4.1(a). Decisions as to custody status, transfers and assignments to housing, work vocational treatment programs and community release programs are made by the Institutional Classification Committee (ICC). N.J.A.C. 10A:9-3.3(a).