**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3800-24

NICHOLAS G. MUCCI,

     Appellant,

v.

NEW JERSEY DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____

Submitted May 11, 2026 – Decided May 22, 2026

Before Judges Natali and Walcott-Henderson.

On appeal from the New Jersey Department of Corrections.

Nicholas Mucci, self-represented appellant.

Jennifer Davenport, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Elizabeth Micheletti, Deputy Attorney General, on the brief).

PER CURIAM

Nicholas G. Mucci, an inmate in the State's correctional system, appeals from a final determination of the New Jersey Department of Corrections (NJDOC) that denied his application for a transfer to a halfway house consistent with the Residential Community Reintegration Program (RCRP) under N.J.A.C. 10A:20-1.3.  We affirm.

Mucci was initially charged in a fifteen-count indictment with:  second-degree aggravated arson, N.J.S.A. 2C:17-1(a)(1); two counts of second-degree knowingly causing widespread injury or damage, N.J.S.A. 2C:17-2(a)(1); third-degree possession of a destructive degree, N.J.S.A. 2C:39-3(a); three counts of third-degree terroristic threats, N.J.S.A. 2C:12-3(a); third-degree possession of a prohibited weapon, N.J.S.A. 2C:39-3(b); fourth-degree possession of an unlawful weapon, N.J.S.A. 2C:39-5(d); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); two counts of third-degree attempted aggravated assault, N.J.S.A. 2C:12-1(b)(7); second-degree unlawful possession of an assault firearm, N.J.S.A. 2C:39-5(f); fourth-degree unlawful possession of large-capacity ammunition, N.J.S.A. 2C:39-3(j); and third-degree hindering prosecution, N.J.S.A. 2C:29-3(b)(1).[1]

---

[1]  Mucci's indictment is not in the record before us.  His judgment of conviction, however, identifies his indictment number and lists the fifteen charges.

He ultimately pled guilty to one count of knowingly causing widespread injury or damage and unlawful possession of an assault weapon, both second-degree charges, and was sentenced to an aggregate eight-year sentence, with 42 months of parole ineligibility. Mucci did not file a direct appeal, instead he challenged his sentence on our sentencing calendar pursuant to Rule 2:9-11. State v. Mucci, No. A-0110-24 (App. Div. Dec. 2, 2025). We affirmed his sentence and concluded it was "not manifestly excessive or unduly punitive and d[id] not constitute an abuse of discretion" and were "further satisfied that in applying the sentencing guidelines, the judge gave detailed reasons to support the sentence in accordance with the plea agreement."

Based on the presentence report in the record, and the plea and sentencing transcripts, Mucci's charges primarily relate to an incident in January 2023 at a church in Asbury Park during an anti-racism gathering. The State alleged Mucci, while wearing a mask, blocked attendees from leaving the church, yelled "white lives matter too," threw two smoke bombs into the crowd, and fled the scene. An hour later, the State maintained Mucci returned to the church's parking lot, exited his car and attempted to disperse pepper spray while again yelling "white lives matter." A subsequent search of Mucci's home revealed an unregistered assault weapon, for which he claimed he did not register because

3

"he did [not] understand [New Jersey]'s gun laws . . . ", due to his recent move from North Carolina.

Mucci applied to participate in the RCRP program. The Institution Classification Committee (ICC) approved his application but specifically noted its "approval shall be contingent upon [Mucci] meeting the eligibility criteria for the [Manual Agreement Program] and subject to acceptance by the program."

Shortly thereafter, the Deputy Director of the Office of Community Programs (OCP) considered Mucci's application and denied his request. He informed Mucci that the OCP had considered his "program participation, classification file, and the nature and details of the offense", and based on the "[f]ield [a]ccount" of the offenses, concluded Mucci's conduct exhibited "impulsive [behavior] . . . which resulted in multiple victims." Mucci was further informed that future approvals would be subject to the review process, and he could reapply for the community program, consistent with NJDOC guidelines.

On appeal, Mucci argues the denial of his RCRP application by OCP was "arbitrary and undermines rehabilitation," one of the objectives of the program. He asserts the sparce basis underlying the administrative denial, which references his alleged "impulsivity" and "multiple victims," is unsupported by

4

the sentencing record and judgment of conviction. Further, he asserts the denial "contradicts" the recommendation from the ICC, which unanimously approved his RCRP application, and ignores his "clean institutional record and work history." Notably, Mucci identifies two "intensive rehabilitative programs" he completed for anger management and substance abuse, in which he received feedback that he possesses "a strong awareness of behavioral triggers and substantial cognitive growth." Finally, he asserts his denial violates the doctrine of fundamental fairness because he was not provided an opportunity "to contest the unfounded allegations" that form the basis of his denial.

Our review of an administrative agency's decision is limited. We will disturb the NJDOC's decision only if it is "arbitrary, capricious or unreasonable," or is unsupported "by substantial credible evidence in the record as a whole." Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980). We further recognize the Commissioner has "complete discretion" to determine an inmate's placement and custody status. Smith v. N.J. Dep't of Corr., 346 N.J. Super. 24, 29 (App. Div. 2001) (citing N.J.S.A. 30:4-91.2). Nonetheless, we will find an abuse of discretion "when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571

(2002) (quoting Achacoso-Sanchez v. Immigration & Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)). "[I]t is a fundamental of fair play that an administrative judgment express a reasoned conclusion . . . [which] requires evidence to support it and findings of appropriate definiteness to express it." N.J. Bell Tel. Co. v. Commc'ns Workers of Am., 5 N.J. 354, 375 (1950) (internal citation omitted).

An inmate does not have a constitutionally protected liberty interest in the decision where to be placed within a correctional institution by a State's penal authority. Sandlin v. Conner, 515 U.S. 472 (1995). "There is no constitutionally protected interest in reduced custody status." Moore v. Dep't of Corr., 335 N.J. Super. 103, 110 (App. Div. 2000). Further, inmates in a halfway house remain in institutional confinement. Shabazz v. N.J. Dep't of Corr., 385 N.J. Super. 117, 125 (App. Div. 2006). And, we have specifically held that "halfway house placement does not involve a liberty interest." Trantino v. N.J. State Parole Bd., 296 N.J. Super. 437, 464 (App. Div. 1997), modified, 154 N.J. 19 (1998).

Rather, in such instances constitutional due process safeguards are necessary only if an inmate's modification of their custody status "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandlin, 515 U.S. at 484. The NJDOC's decision to

6

deny an inmate's request to be transferred to a halfway house does not reflect an "atypical" or "significant" hardship. Shabazz, 385 N.J. Super. at 123 (quoting Sandlin, 515 U.S. at 484).

The NJDOC, however, has circumscribed the discretion over inmate placement by adopting regulations that delegate such decisions to various agency officials, subject to prescribed factors. See Cnty. of Hudson v. N.J. Dep't of Corr., 152 N.J. 60, 70 (1997) ("[A]n administrative agency ordinarily must enforce and adhere to, and may not disregard, the regulations it has promulgated."). Specifically, with respect to RCRP placement, an extensive administrative code has been promulgated that vests an initial decision in the prison's ICC, after the Institutional Community Release Program Coordinator determines that the inmate has met the eligibility criteria for placement, N.J.A.C. 10A:20-4.10(a).

As a general matter, an ICC is responsible for, among other duties, "review of inmate applications for change in custody status." N.J.A.C. 10A:9-3.1. With respect to RCRP participation specifically, initial approval by the ICC is dependent upon the "general eligibility criteria" set forth in N.J.A.C. 10A:20-4.4, the inmate's present or previous parole violations, the inmate's previous failure in an RCRP, and the "decision-making criteria" set forth in N.J.A.C.

10A:9-3.3, which apply generally to any ICC decision on a custody status.[2] N.J.A.C. 10A:20-4.10.

The RCRP-specific criteria set forth in N.J.A.C. 10A:20-4.4 includes the following: (1) achievement of full minimum status, (2) risk to public safety, (3) a psychological evaluation, (4) medical and dental certification, (5) "a satisfactory overall correctional facility adjustment with recommended educational and therapeutic program participation," (6) completion of the proper forms "for those inmates who are interested in participating," (7) approval of those forms by the ICC "as the initial step in the approval process," (8) approval by the Residential Community Reintegration Program Notification Committee, (9) review by the Assessment and Treatment Center, and (10) "initial approval based on the criteria set forth by the [ICC] and [OCP] Classification and Assignment Unit."[3]

In addition, the regulations establish time frames for eligibility, in view of established or anticipated parole dates or eligibility or a "max-out" date, so

---

[2] N.J.A.C. 10A:9-4.5(a) sets forth additional "relevant factors" of which the ICC generally "shall take into consideration . . . in making decisions to reduce an inmate's custody status." These factors include, but are not limited to, a "[f]ield account of the present offense." N.J.A.C. 10A:9-4.5(a)(1).

[3] We note, before us, neither party disputes Mucci is otherwise eligible for RCRP besides approval from OCP.

long as the inmate does "not demonstrate an undue risk to public safety," and has not committed arson or certain sex offenses. N.J.A.C. 10A:20-4.5. Further, a prison administrator may overrule the ICC's approval "when the [a]dministrator has information that was not available to [the ICC] when the . . . application was approved." N.J.A.C. 10A:20-4.10(c). The administrator, however, may not overrule the ICC's disapproval of an application. N.J.A.C. 10A:20-4.10(b).

After the ICC makes its initial decision, the regulatory scheme, in several places, empowers and affirms OCP's authority over RCRP participation, including, as is before us, overriding an ICC decision to place an inmate in an RCRP. See N.J.A.C. 10A:20-4.4(b) ("[OCP] shall make the final recommendation for [RCRP] participation for all inmates"); N.J.A.C. 10A:20-4.10(e) (notifying "an inmate, in writing, of the status of the inmate's application to a [RCRP] only upon final approval by [OCP]"); N.J.A.C. 10A:20-4.12(h) ("[OCP] shall have final approval or disapproval authority for the participation of all inmates in the Residential Community Reintegration Program").

Applying the aforementioned standard of review, we discern no legal basis to interfere with the NJDOC's decision here. The OCP considered Mucci's program participation as well as his classification file and properly considered

9

the serious and disturbing facts and circumstances underlying his convictions, which are significantly more serious than Mucci's current attempts to minimize them and, contrary to his contentions, support the OCP's conclusion his conduct exhibited, at a minimum, "impulsive" behavior that led to "multiple victims." The statements in the presentence report as well as Mucci's comments at his plea and sentencing transcripts fully support these findings. The NJDOC, in considering the nature of the offenses, and the facts underlying them, did not act in an arbitrary, capricious or unreasonable manner as they are clearly relevant considerations to the extent they impact public safety. N.J.A.C. 10A:20-4.4(a)(2). In sum, the NJDOC's decision is supported by substantial credible evidence in the record.

Any contentions raised by the parties that we have not addressed lack sufficient merit to warrant discussion in this written opinion. R. 2:11-3(e)(1)(D).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3800-24