928 A.2d 1 (2007)
394 N.J. Super. 517
Ronald JAMGOCHIAN, Appellant,
v.
NEW JERSEY STATE PAROLE BOARD, Respondent.
Superior Court of New Jersey, Appellate Division.
Argued May 16, 2007.
Decided July 12, 2007.
*3 Joseph S. Murphy, Ringwood, argued the cause for appellant.
Lisa A. Puglisi, Deputy Attorney General, argued the cause for respondent (Stuart Rabner, Attorney General, attorney; Patrick DeAlmeida, Assistant Attorney General, of counsel; Ms. Puglisi, on the brief).
Before Judges WEFING, PARKER and C.S. FISHER.
The opinion of the court was delivered by
FISHER, J.A.D.
Upon his release from prison in 2001, appellant Ronald Jamgochian began serving a term of community supervision for life, N.J.S.A. 2C:43-6.4(b). Four years later, his parole officer imposed a curfew, which required Jamgochian's confinement to his residence every day from 8:00 p.m. to 7:00 a.m., for an indefinite period of time. We agree with Jamgochian's contention that N.J.A.C. 10A:71-6.11(l) provides an inadequate procedural framework upon which to rest this limitation on his liberty interests and deprived him of a meaningful opportunity to be heard. We remand for further proceedings consistent with due process.

I
In 1979, Jamgochian was convicted of kidnapping and various sex offenses, and sentenced to a twelve-year term of imprisonment. Neither the 1979 judgment of conviction nor any other information regarding this conviction can be found in the record except for a brief recitation of some of the alleged details, which is contained in *4 a November 1998 confidential report prepared by the Adult Diagnostic and Treatment Center. It is not clear whether or to what extent these 1979 convictions and the underlying circumstances were considered in the proceedings relevant to the present appeal.
In 1998, defendant was convicted of committing a second-degree sexual assault on S.S. According to a pre-sentence report contained in the record,[1] Jamgochian initially approached S.S., stating that his uncle had seen her photographs and wanted to know if she would be interested in modeling for him. After speaking with S.S. on a few occasions, Jamgochian arranged for her to travel to New Jersey from California for a test shoot. In February 1997, S.S. arrived in New Jersey and posed for Jamgochian.
Following S.S.'s return to California, Jamgochian inquired about her interest in posing for the cover of a romance novel. After she indicated her willingness, Jamgochian arranged to have S.S. return to New Jersey on June 7, 1997. Upon arriving at Jamgochian's studio, S.S. was presented with a contract, which referred to a "music video," and contained phrases such as "exposed in a sexual manner," "exploit," and "Internet," causing S.S. to balk and begin asking questions. Because Jamgochian assuaged all her concerns, and also offered to revise the contract, S.S. later indicated that she felt "stupid and uncomfortable" for hesitating, and signed the contract.
Jamgochian photographed S.S. wearing a bra and panty leopard suit. He then said he was going to photograph her wearing "restraints." He chained her wrists and ankles together, and then fastened her arms and legs to the bed. S.S. later reported that she was in fear and felt completely helpless. Jamgochian left the room but returned with a document, which indicated what he wanted S.S. to do. He also told S.S. that she had two options. The first was that he would go and contact two other men he had waiting nearby and she would have to have sex with them, which he would videotape, or she would have to do anything he wanted while he videotaped it. She acceded to the latter demand.
Jamgochian then released S.S. from all restraints except the handcuffs. He retrieved a twenty-two page script, and told S.S. that they were going to "act out" the scenes, which he would videotape. When S.S. began to cry, Jamgochian told her that if she did not stop, he would call the two other men. She agreed to cooperate and gave in to Jamgochian's demands for her to perform various sex acts, which did not terminate until S.S. began acting as if she was hyperventilating. She was then permitted to dress and they went for a ride. When they returned to Jamgochian's studio, S.S. ran from his vehicle and into a nearby convenience store, shouting for help.
On September 2, 1997, Jamgochian was indicted and charged with second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1), third-degree criminal restraint, N.J.S.A. 2C:13-2(b), third-degree criminal coercion, N.J.S.A. 2C:13-5(a)(1), and third-degree terroristic threats, N.J.S.A. 2C:12-3(a). On April 22, 1998, he was charged in another indictment with third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(c)(1), and second-degree being a person not permitted to possess weapons, *5 N.J.S.A. 2C:39-7. On July 27, 1998, Jamgochian pled guilty to the second-degree sexual assault count in the first indictment and the second-degree being a person not permitted to possess weapons count in the second indictment.
On February 5, 1999, the trial judge imposed a four-year term of imprisonment on the second-degree sexual assault conviction, and directed that Jamgochian comply with all requirements of Megan's Law, N.J.S.A. 2C:7-2. The judge also imposed a special sentence of parole supervision for life, N.J.S.A. 2C:43-6.4.

II
Jamgochian was released from incarceration on October 4, 2001. At that time, by operation of law, he began serving the community supervision for life term. See N.J.S.A. 2C:43-6.4(b); State v. Williams, 342 N.J.Super. 83, 92, 775 A.2d 727 (App. Div.2001).
A sentence of community supervision for life means that the offender "shall remain in the legal custody of the Commissioner of Corrections, shall be supervised by the Division of Parole of the State Parole Board, shall be subject to the provisions and conditions set forth in [N.J.S.A. 30:4-123.51(b); N.J.S.A. 30:4-123.59 through 30:4-123.63; and N.J.S.A. 30:4-123.65], and shall be subject to conditions appropriate to protect the public and foster rehabilitation." N.J.S.A. 2C:43-6.4(b). We have held that, as a general matter, the Legislature did not violate the separation of powers doctrine by delegating to the Parole Board the authority to promulgate conditions and other procedures applicable to persons placed on community supervision for life. State v. Bond, 365 N.J.Super. 430, 442, 839 A.2d 888 (App. Div.2003).
Upon his release from prison, Jamgochian executed a document containing the general conditions applicable to the community supervision for life term. This document included Jamgochian's acknowledgement that he would "comply with any curfew established by the assigned parole officer." When released, however, Jamgochian was not subjected to a curfew of any sort. Instead, on April 15, 2005  nearly four years after his release from incarceration  he was advised by his parole officer that because of some contact or communication Jamgochian had with a young woman (hereinafter "Jane Doe") he was to "comply with a curfew and be at [his] approved residence between the hours of 8:00 pm and 7:00 am daily."[2]
The parole officer's April 15, 2005 letter presented the following justification for his imposition of this curfew:
Jamgochian contacted [Jane Doe] after obtaining her personal information from an unknown source and attempted to arrange a meeting to discuss employment. As described by Jamgochian, this employment would be for a short time period and pay an inordinately large sum of money. Jamgochian has a history of sexual offenses involving victimization of women he lured by offering them modeling work. The current behavior of Jamgochian towards [Jane Doe] fits his identified offense cycle/modus operandi. This Special Condition will curtail Jamgochian's ability to commit further acts of victimization.
In response, Jamgochian's attorney wrote to the Chairman of the Parole Board on April 27, 2005, complaining of the imposition *6 of the special conditions. Relying upon a certification executed by his client, the attorney claimed that the factual reasons given for the parole officer's imposition of the special conditions were erroneous, and, also, that the special conditions had been championed by a parole officer who had "acted unprofessionally, and perhaps even unethically, in his investigation and pursuit" of Jamgochian. He requested that the conditions be vacated and, failing that, the entry of a stay of the special conditions pending an appeal to this court.
On May 5, 2005, the Chairman wrote to Jamgochian's attorney advising that, on May 4, 2005, "the Adult Panel reviewed the cited special conditions, chronological supervision reports and attendant police investigation reports from the Hanover and Rockaway Township Police Departments" and that, "[b]ased upon such review," the panel had affirmed the imposition of all the special conditions. The Chairman further indicated that the Adult Panel found that Jamgochian's "adherence to the special conditions will reduce the likelihood of recurrence of criminal behavior."
The factual basis for the imposition of all three special conditions was expressed by the Chairman in the following way:
On 4/15/05, [Jane Doe] reported to the Hanover PD that Mr. Jamgochian contacted her by cell phone and in person; that he engaged her in conversations that made her feel uncomfortable; that he offered to engage her in employment for unknown services; and that based upon the nature and circumstances of Mr. Jamgochian's current and past offenses wherein Mr. Jamgochian also engaged young females to his employ resulting in him sexually assaulting the victims, [a special condition of no contact with Jane Doe] will lessen the likelihood of his return to criminal activity.
In 1980 and 1999, Mr. Jamgochian was convicted of crimes involving the luring of females for the purpose of engaging in deviant sexual conduct. The Adult Panel notes that the recent incident involving [Jane Doe] is alarmingly similar to the precursors employed by Mr. Jamgochian prior to engaging in his past criminal conduct. Accordingly, participation in sex-offender specific mental health counseling will assist Mr. Jamgochian in exploring any underlying issues as they relate to his poor judgment, lack of insight and apparent inability to desist from the repetitive behavior that he has engaged in that led to his two prior convictions, as well as, the present situation with [Jane Doe]. . . .
Based upon Mr. Jamgochian's recent conduct involving [Jane Doe,] compliance with the above-noted curfew will allow the Division of Parole to better monitor his whereabouts and activities and, thus, will seek to lessen the likelihood of Mr. Jamgochian's return to criminal activity.
The Chairman also instructed the Division of Parole to "re-draft" the special conditions utilizing the justification for those conditions quoted above. He lastly indicated that Jamgochian's allegations of his parole officer's misconduct had been forwarded to the Director of the Division of Parole.
On May 23, 2005, the special condition that required Jamgochian to comply with a curfew was amended, pursuant to the Chairman's directions, by eliminating the factual basis contained in the April 15, 2005 notice, and replacing it only with the following conclusory statement:
Based upon your recent conduct involving [Jane Doe,] compliance with the above noted curfew will allow the Division *7 of Parole to better monitor your whereabouts and activities and thus, will seek to lessen the likelihood of your return to criminal activity.
Gone were the prior findings that Jamgochian had contacted Jane Doe, and that he arranged to meet with her to discuss employment "for a short time period and pay an inordinately large sum of money," and gone was the Adult Panel's conclusion that this alleged conduct "fits [Jamgochian's] identified offense cycle/modus operandi."
Following this revision in the special conditions, Jamgochian's attorney requested copies of the reports and information reviewed and relied upon by the Adult Panel. The Parole Board provided copies of: the handwritten notes of Jamgochian's parole supervisor; a police report regarding the information provided by Jane Doe; and other police reports memorializing attempts to determine whether the person Jane Doe referred to as "Ron" was Jamgochian. Also provided was a memorandum, dated April 18, 2005, written by an assistant district supervisor, which summarized: the police reports; his discussions with a police detective regarding Jane Doe; his instruction to the parole officer to advise Jamgochian that he both have no further contact with Jane Doe or her place of employment and that he thereafter comply with a curfew; and his direction that the parole officer search Jamgochian's home. If the Adult Panel relied on anything else, it was not revealed.
On November 4, 2005, Jamgochian's attorney wrote to the Chairman, claiming that the imposition of the curfew was unlawful and inappropriate. He provided a certification executed by Jamgochian, and requested that the letter be considered as Jamgochian's appeal to the full Parole Board. In asserting that the procedures utilized in imposing the curfew were insufficient, Jamgochian argued in this letter that there had not been "the slightest nod to due process" and that the special conditions
were imposed without any hearing, without Mr. Jamgochian being given the right: to view the evidence against him, without giving him any discovery, and without giving him the right to confront witnesses against him. It was based upon reports and writings that were not sworn to and were full of hearsay and vague accusations. There was no competent legal evidence introduced to support those accusations.
Invoking, among other things, the constitutional rights guaranteed by the federal constitution, U.S. Const., amend. VI and XIV, and our state constitution, N.J. Const. art. I, ¶s 1 and 10, Jamgochian requested a hearing at which he would be permitted the right "to cross examine any witnesses, have an attorney present, obtain discovery, receive copies of all materials submitted to the board, and subpoena witnesses in order to confront his accusers and mount a defense."
On February 24, 2006, the Chief of the Parole Board's Appeals Unit wrote to Jamgochian's attorney to advise that the full Parole Board had considered the issues raised in his appeal. He stated that the Board "noted that the Adult Panel was not required by [N.J.A.C. 10A:71-6.11(l)] to conduct a hearing or provide your client with documentation prior to affirming the imposition of the special conditions for community supervision for life." According to this letter, the Parole Board also rejected Jamgochian's contention that there was an insufficient factual basis for the imposition of a curfew, indicating that the Board had considered the police report, which incorporated Jane Doe's assertion that Jamgochian made telephone *8 calls to her that made her "feel uncomfortable."
Jamgochian filed a notice of appeal, seeking our review of this final agency decision.
While this appeal was pending, the Board placed the curfew in abeyance. The Board has since moved for dismissal, claiming that the appeal is now moot. We turn first to the question of mootness.

III
Jamgochian has argued that his appeal has not been rendered moot because the Board recently placed the curfew in "abeyance." He argues that this recent action regarding the curfew contains no guarantee that the Board will not lift that restraint and again require Jamgochian's adherence to the curfew at some future time. He argues that the Board's power to unilaterally turn on and off the application of the curfew should not be permitted to control or preclude this court's review of the proceedings that led to the imposition of the curfew and the sufficiency of the regulations that formed the basis for the Board's determination.
We agree that this appeal raises issues of substantial importance that are likely to recur but evade review, Coyle v. Bd. of Chosen Freeholders, 170 N.J. 260, 263, 787 A.2d 881 (2002); Zirger v. General Acc. Ins. Co., 144 N.J. 327, 330, 676 A.2d 1065 (1996), and that we should therefore consider the merits of the appeal.

IV
Jamgochian argues that the principles of due process required greater protections than were permitted here. In concluding that the procedures utilized in imposing the curfew were flawed: (a) we reject Jamgochian's argument that the Parole Board has no authority to impose a curfew; (b) but we agree with Jamgochian that, notwithstanding the Board's power to impose a curfew, it could not validly exercise that authority without providing greater procedural safeguards and, thus, deprived him of due process of law; (c) alternatively, we conclude that the doctrine of fundamental fairness requires more extensive procedures than permitted here; and (d) we find that the absence of any procedural framework whereby Jamgochian could seek review, in the future, of the continued need for this curfew also violated his due process and fundamental fairness rights.

A
As we have recognized, in enacting N.J.S.A. 2C:43-6.4(b), the Legislature provided that persons serving a special sentence of community supervision for life, although "not actually on parole," shall be supervised "as if on parole." State v. Williams, supra, 342 N.J.Super. at 92, 775 A.2d 727. See also Sanchez v. N.J. State Parole Bd., 368 N.J.Super. 181, 187, 845 A.2d 687 (App.Div.2004), app. dis., 187 N.J. 487, 901 A.2d 951 (2006); State v. Bond, supra, 365 N.J.Super. at 443, 839 A.2d 888. In fulfilling this obligation, the Parole Board's polestar is the statute itself, which declares that a person serving a special sentence of community supervision for life shall be subject "to conditions appropriate to protect the public and foster rehabilitation." N.J.S.A. 2C:43-6.4(b). It requires no further proof to conclude that the compelling interests so succinctly stated in N.J.S.A. 2C:43-6.4(b) fully empower the Parole Board to impose a curfew upon an individual who has engaged in conduct that threatens the public or does not foster rehabilitation.
We, thus, reject the argument that the Parole Board, in fulfilling its duty to supervise such individuals, is prohibited from imposing a curfew tailored to vindicate those interests. So long as a curfew is not invoked arbitrarily, and so long as *9 the curfew bears a reasonable relationship to the rehabilitation of the individual, the protection of society or the prevention of recidivistic behavior, Pazden v. N.J. State Parole Bd., 374 N.J.Super. 356, 366-67, 864 A.2d 1136 (App.Div.2005); N.J.S.A. 30:4-123.59(b), we will defer to the Board's exercise of sound discretion in imposing such a condition, Trantino v. N.J. State Parole Bd., 154 N.J. 19, 25, 711 A.2d 260 (1998).

B
Jamgochian more persuasively argues that the Board was without the authority to impose a curfew of such scope and duration absent the granting of greater procedural safeguards than presently exist.
Upon the imposition of a term of community supervision for life, the individual is automatically required to comply with twenty "general" conditions, N.J.A.C. 10A:71-6.11(b), one of which requires that the offender "[c]omply with any curfew established by the assigned parole officer." N.J.A.C. 10A:71-6.11(b)(17). Since no curfew was imposed at the time Jamgochian began serving his term of community supervision for life, any later imposition of a curfew required compliance with the procedures applicable to special conditions.
N.J.A.C. 10A:71-6.11(l) contains the procedure promulgated by the Parole Board for the imposition of special conditions:
Additional special conditions may be imposed by the District Parole Supervisor, an Assistant District Parole Supervisor or the designated representative of the District Parole Supervisor when it [sic] is [of] the opinion that such conditions would reduce the likelihood of recurrence of criminal behavior. The offender and the Board shall be given written notice upon the imposition of such conditions.
1. Upon notice being received by the Board, the appropriate Board panel shall review the offender's case and determine whether to vacate, modify or affirm the additional special condition(s).
2. The Board panel shall notify the District Parole Supervisor of its determination within three working days of receipt of notice of the imposition of the additional special condition(s).
3. The District Parole Supervisor shall notify the offender in writing of the determination of the Board panel and shall cause a written record of such notice to be made in the offender's case file.
4. A special condition shall not be deemed effective until affirmed by the appropriate Board panel.
Jamgochian does not claim that the administrative proceedings failed to conform with N.J.A.C. 10A:71-6.11(l). Instead, he claims that those procedures are inadequate and fail to conform with the principles of procedural due process guaranteed by the federal and state constitutions. We agree.
As can be readily seen, N.J.A.C. 10A:71-6.11(l) outlines a process that operates without the input or involvement of the affected individual. The individual is entitled to notice "upon imposition of the condition" and notice of the Adult Panel's determination in its review of the propriety of the condition. But the regulation does not permit the individual to participate and does not provide any other rights normally associated with the principles of due process.
For example, this regulation does not allow an individual serving a term of community supervision for life: to be heard, *10 either with or without counsel, prior to the rendering of a decision by the Adult Panel; to view the evidence prior to the rendering of the Adult Panel's decision; to confront or call witnesses; or to offer relevant evidence. In addition, the regulation contains no standards or limitations regarding the type of information that the Adult Panel or the Parole Board may consider in imposing a special condition. As a result, N.J.A.C. 10A:71-6.11(l) permits the imposition of a special condition upon the consideration of the rankest of hearsay, and by way of a process that excludes the input or participation of the individual affected.
The Fourteenth Amendment of the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In broader language, our state constitution declares that "[a]ll persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." N.J. Const. art. I, ¶ 1. Although this provision of our state constitution does not actually include the phrase "due process," it is well understood that, like the Fourteenth Amendment, it "protects against injustice and, to that extent, protects `values like those encompassed by the principle[ ] of due process.'" Doe v. Poritz, 142 N.J. 1, 99, 662 A.2d 367 (1995) (quoting Greenberg v. Kimmelman, 99 N.J. 552, 568, 494 A.2d 294 (1985)). In considering the application of these principles, we are required to determine whether a curfew infringes a liberty interest and, if so, whether the existing procedural framework fairly and adequately safeguards that liberty interest from arbitrary or unreasonable governmental restriction.
As to the first aspect, the Parole Board does not argue, and it cannot be seriously alleged, that a prohibition from being anywhere except within the confines of one's home, every day, for eleven consecutive hours, does not impact the liberty interests secured by the federal and state constitutional guarantees of due process of law. Instead, the troubling issue presented by this appeal is whether the existing procedures adequately safeguard such a liberty interest from arbitrary governmental infringement. In considering this contention in the present context, we are satisfied that greater procedural protection was due than currently provided by N.J.A.C. 10A:71-6.11(l).
Due process is a flexible concept. Zinermon v. Burch, 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100, 114-15 (1990); Doe v. Poritz, supra, 142 N.J. at 106, 662 A.2d 367. As Justice Frankfurter said, "`Due process' is, perhaps, the least frozen concept of our law  the least confined to history and the most absorptive of powerful social standards of a progressive society." Griffin v. Illinois, 351 U.S. 12, 20-21, 76 S.Ct. 585, 591, 100 L.Ed. 891, 900 (1956) (concurring opinion). At its most basic level, the concept of due process requires that an individual be given notice and the opportunity to be heard when the government seeks to limit or curtail a protectable interest. Goss v. Lopez, 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725, 737 (1975); Doe v. Poritz, supra, 142 N.J. at 106, 662 A.2d 367. This constitutional guarantee is understood as providing the individual with "an opportunity to be heard at a meaningful time and in a meaningful manner." Ibid. (citing Kahn v. United States, 753 F.2d 1208, 1218 (3rd Cir.1985)).
How elaborate procedures must be in order to comply with the principles of due process depends upon the following factors:

*11 [F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
[Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976).]
In weighing these three factors, we are abundantly satisfied that the procedures delineated in N.J.A.C. 10A:71-6.11(l) are, in this context, wanting.

(1)
The first factor of the Mathews calculus requires consideration of the private interests affected by government action. The interest in being free from physical detention by the government is "the most elemental of liberty interests." Hamdi v. Rumsfeld, 542 U.S. 507, 529, 124 S.Ct. 2633, 2646, 159 L.Ed.2d 578, 599 (2004). A curfew that requires an individual to remain in his residence, every day, for an eleven hour period, represents a significant burden on an individual's liberty interests, which is only enhanced by the fact that a violation of that condition without good cause constitutes a fourth-degree offense and poses a risk of re-incarceration.

(2)
In considering the second Mathews factor, we observe that the manner of the Board's review presented a great potential for an erroneous deprivation of Jamgochian's liberty interests. That is, the record before the Adult Panel, and the full Parole Board, consisted entirely of written materials, most if not all of which constituted hearsay. The makers of these statements were not called as witnesses. Indeed, Jane Doe, who was the only person with personal knowledge of what it was that Jamgochian may have said or done that might have warranted the imposition of a curfew, was not called as a witness; only an unsworn, unauthenticated statement purportedly written by Jane Doe, which was appended to a police report, was considered.
Jane Doe's unsworn statement represented the "best" evidence placed before either the Adult Panel or the full Board as to any conduct that might have warranted the imposition of a curfew. Yet, Jamgochian was not given access to that document, or any others, prior to the decision of the Adult Panel. He was not given the opportunity to rebut that "evidence." He was not allowed to argue to the Adult Panel that statements other than those made by individuals with personal knowledge should have been considered. He was not given the opportunity to urge that witnesses be called and that the Adult Panel or Parole Board should consider information of greater substance than the hearsay statements provided. And he was not given the right to confront and cross-examine any of the persons whose information was considered by the Adult Panel and the Parole Board.
It is also important to emphasize that there is a greater opportunity for an erroneous determination when the only information provided to the decision maker consists of written statements, which were not subject to cross-examination, and when the individual whose liberty interest is at stake has had no opportunity to know of the contents of the statements or to provide his own testimony or other evidence in response. To paraphrase Justice White's comments regarding the extent of *12 process due to students suspended from school without a hearing, "although proceeding in utmost good faith," officials charged with making such decisions "frequently act on the reports and advice of others." Goss v. Lopez, supra, 419 U.S. at 580, 95 S.Ct. at 738, 42 L.Ed.2d at 738. Despite good faith efforts, as Justice White recognized, "the controlling facts and the nature of the conduct under challenge are often disputed"; as a result, "[t]he risk of error" when proofs are limited to a cold record of mostly hearsay statements "is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference" with the governmental interest in question. Ibid. The disposition of a matter such as that presented here is troubled by the same possibilities.
The likelihood of erroneous outcomes is also increased by the one-sided nature of the proceedings. Jamgochian and his attorney were precluded from the "hearing" that took place before the Adult Panel. Simple common sense suggests that the chances of a mistaken determination are greatly increased when only one side to a controversy is invited to participate.
The deprivation of cross-examination represents yet another basis for questioning the accuracy of the outcomes produced by the procedures currently employed by the Parole Board in such matters. The importance of cross-examination, "one of the greatest engines that the skilled man has ever invented" for ascertaining the truth of a matter, 6 Wigmore on Evidence § 1838 (Chadbourn Rev.1976), has not been understated. Yet the right to the cross-examination of Jane Doe was completely denied here and, with that deprivation, the Adult Panel and the Parole Board failed to take advantage of a valuable tool for deciphering the truth of the matter.[3]
In addition, while we have no basis for believing it so here  chiefly because the accuracy of the information considered by the Adult Panel and the full Board was never tested in an adversarial setting  it is not so far-fetched to believe that an utterly false accusation could be presented and still produce the results obtained here. Procedures that so thoroughly exclude an adverse party's participation invite the possibility that the good faith of the Adult Panel and the Board could be thwarted by faceless individuals with a grudge or vendetta against an individual. See, e.g., Peters *13 v. Hobby, 349 U.S. 331, 350-51, 75 S.Ct. 790, 800, 99 L.Ed. 1129, 1143-44 (1955) (Douglas, J., concurring). As we have already observed, Jamgochian alleged that such forces were at work here, but the Board merely passed those allegations along to the Director of the Division of Parole.
It is not for the interests of Jamgochian alone that the second Mathews factor compels the granting of greater procedural rights than were afforded here. It is equally important to society that governmental bodies not proceed in such matters on "erroneous information or because of an erroneous evaluation" of the information at hand. Morrissey v. Brewer, 408 U.S. 471, 484, 92 S.Ct. 2593, 2601, 33 L.Ed.2d 484, 496 (1972). See also Carey v. Piphus, 435 U.S. 247, 266, 98 S.Ct. 1042, 1054, 55 L.Ed.2d 252, 266-67 (1978) (noting "the importance to organized society that procedural due process is observed"). In considering the procedural rights required when the government seeks to revoke an individual's parole, Chief Justice Burger, in speaking for the Court in Morrissey, observed that society has an interest "in treating the parolee with basic fairness: fair treatment in parole revocations will enhance the chance of rehabilitation by avoiding reactions to arbitrariness." Ibid.
We likewise believe that these societal interests are endangered in this similar setting. Jamgochian's past conduct, and alleged more recent conduct  fairly viewed with repulsion and legitimate alarm for the safety of the public  does not justify a deprivation of the requirements of due process. Hamdi v. Rumsfeld, supra, 542 U.S. at 531, 124 S.Ct. at 2647, 159 L.Ed.2d at 600; O'Connor v. Donaldson, 422 U.S. 563, 575, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396, 407 (1975). When an adversarial proceeding, which would better test the accuracy of the charges leveled against the individual, is precluded by governmental regulation, not only is there an increased potential for inaccurate conclusions, but a sense of unfairness inevitably adheres to whatever result is achieved.
We thus conclude that the application of the first two Mathews factors  in light of the significant liberty deprivation imposed by the Parole Board  mandates more extensive procedural rights than presently permitted by N.J.A.C. 10A:71-6.11(l). However, we are in no position to determine what additional procedures should be adopted because the record on appeal contains insufficient information for a thorough evaluation and assessment of the third Mathews factor.

(3)
The third Mathews factor requires that we consider "the Government's interest." Mathews, supra, 424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33. Of course, the State does not have an interest in resolving such matters without at least "some informal procedural guarantees." Morrissey, supra, 408 U.S. at 483, 92 S.Ct. at 2601, 33 L.Ed.2d at 495. Nor is there a valid State interest in insulating, from closer scrutiny, the Parole Board's discretion to restrict an individual's liberty that would justify its preclusion of adversarial hearings. The State, however, does have an interest in "the function involved"  here, the supervision of individuals serving community supervision for life terms  as well as "the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews, supra, 424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33. Consideration of the procedural safeguards required, thus, must include not only a weighing of the Board's obligation to supervise against the individual's liberty interests, but also an accounting of the costs in money and time *14 that would be increased by the adoption of additional procedures.
In this regard, we are mindful of the need for the expeditious resolution of such matters. It may very well be that the record formed on remand will support the Board's view that Jamgochian's communications with Jane Doe suggest that he was, as alleged, cultivating a new victim. If true, a delay in the imposition of a curfew would be troubling.
But there is no reason to believe that the interests served by the rapid imposition of a curfew and the providing of greater procedural rights cannot be harmonized. We do not see why a curfew might not be temporarily imposed in appropriate circumstances prior to the conducting of a hearing that would guarantee all the process due. Although the principles of due process normally require an opportunity to be heard prior to a liberty deprivation, see, e.g., Zinermon, supra, 494 U.S. at 127, 110 S.Ct. at 984, 108 L.Ed.2d at 115; Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494, 503-04 (1985), it is, in the final analysis, not just the individual's liberty interests, but also the public's right to be secure from potentially dangerous offenders that must be safeguarded. As a result, when quick action is necessary and a pre-deprivation process is impractical, a post-deprivation hearing may satisfy the requirements of due process. See, e.g., Logan v. Zimmerman Brush Co., 455 U.S. 422, 436, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265, 278 (1982). The constitutional principles girding our judgment can accommodate both the societal interest and the individual's right to a meaningful opportunity to be heard, by permitting a pendente lite curfew ultimately subject to a rapid final agency determination that would encompass all appropriate procedural safeguards.
Although we are convinced that Jamgochian was deprived of procedural due process at the agency level,[4] we will not presently attempt to define the scope of a constitutional procedural framework in this setting.
In response to our inquiries, the Board has provided raw data regarding the number of hearing officers and Board members available to conduct the hearings presently required by law in other matters within the Board's jurisdiction, as well as statistics concerning the number of hearings in other matters that are conducted on a monthly basis. In addition, we are told that there are presently 3,334 individuals on community supervision for life, and that 233 of these individuals are currently subject to curfews. These figures are helpful in our gaining a perspective, as a general matter, of the potential increase in the Board's caseload that evidentiary hearings in such matters might impose. But these statistics do not convince us that providing a greater panoply of rights, as urged by *15 Jamgochian, would open the floodgates nor are we presently convinced that there is merit to the Board's conclusory contention that "the current caseload for both hearing officers and Board members cannot be increased without detriment." In any event, we conclude that appropriate deference to the Board requires that we decline to mandate any specific guidelines for the adjudication of such matters in the future.[5] We leave this question for the Board's consideration in the first instance.

C
Our dissenting colleague would allow the Board to adjust the extent of due process rights in this context through an ad hoc case-by-case methodology, and has concluded that, in these circumstances, this standard would not entitle Jamgochian to any additional process than he already received because the record, in our colleague's view:
does not disclose any statements by [Jamgochian] that . . . could be characterized as a denial of the allegations made by Jane Doe. In the absence of such a denial, I am unwilling to conclude that these proceedings, and the regulations under which they were held, were deficient.
[Post, 394 N.J.Super. at 555, 928 A.2d 24.]
In relying upon Bolyard v. Berman, 274 N.J.Super. 565, 644 A.2d 1122 (App.Div.), certif. denied, 138 N.J. 272, 649 A.2d 1291 (1994), our colleague would link the process due in this setting to whether the individual has made "a timely and colorable" denial of the factual basis for the curfew. Post at 556, 928 A.2d 24.[6] We further assume that compliance with this test would be governed by the Board's unilateral view of the sufficiency and timeliness of the individual's denial. We reject this proposed standard because, if adopted, it would substitute an unpredictable and potentially arbitrary methodology for the approach mandated by Mathews v. Eldridge, supra, 424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33, which we outlined earlier.
We would also observe that the existing regulations do not provide a mechanism by which this proposed "timely and colorable" test could be triggered or analyzed. The existing regulations do not provide an individual with the opportunity or right to respond.
*16 In addition, we reject our colleague's view that Jamgochian's uninvited response to the imposition of the curfew fails to meet the standard urged in the dissenting opinion. As we have already observed, Jamgochian's counsel wrote to the Chairman of the Board after the curfew was imposed, and provided a copy of Jamgochian's certification. In comparing this submission with the "timely and colorable" test proposed, our colleague has concluded that Jamgochian did not deny Jane Doe's allegations. We disagree. As revealed by that part of Jamgochian's certification also quoted in the dissenting opinion, Jamgochian vociferously disputed the allegations upon which the curfew was based:
16. [The parole officer] then told me he had received orders from Trenton and that I had to sign these two papers. One said that I could not go near [Jane Doe] and thereafter he verbally added the Diner [where she worked] and the second was that I had a curfew.
17. I told him that this was all bullshit. That even if I made a call, what would that have to do with a curfew? I also told him that I would stay away from the Diner and I did not care about that.
[Emphasis added]
Although the expletive used by Jamgochian to describe the factual basis for the imposition of a curfew lacked charm, we think it must be viewed as a rather emphatic denial of the Board's contentions.[7] And, although our colleague does not suggest that Jamgochian's papers were untimely, we would observe for the sake of completeness that Jamgochian's papers were forwarded to the Board twelve days after notification of the imposition of the curfew. Accordingly, even under the approach suggested by our colleague, we would conclude that Jamgochian both timely and colorably denied the allegations and that  even if we were to apply the approach suggested in the dissenting opinion  Jamgochian would be entitled to an evidentiary hearing.
We also find inconsistent our colleague's broad interpretation of Jane Doe's statement, in which Jane Doe only concluded that the alleged conversation with Jamgochian made her feel "uncomfortable," as well as her assumption that Jane Doe's statement is true, with our colleague's narrow interpretation of Jamgochian's rather forceful denial.[8] This reasonable debate over the meaning of these statements, we respectfully suggest, further illuminates the danger in basing such a significant deprivation of an individual's liberty interests upon legitimate differences of opinion as to the meaning of written statements that have not been tested through a process that requires the speaker to take the oath and undergo cross-examination.
Our colleague also states that compelling Jane Doe to appear and testify poses "a significant `danger that the hearing body would be less attuned to the parolee's rehabilitation needs because it would be distracted by the adversarial nature of the proceedings.'" Post at 557, 928 A.2d 25 *17 (quoting Bolyard, supra, 274 N.J.Super. at 573-74, 644 A.2d 1122). We doubt whether an agency which conducts as many hearings as does the Board,[9] and whose decisions we ordinarily apply a standard of review that defers to its determinations unless arbitrary or capricious[10] because of its expertise in such matters, would be distracted by the presence of an attorney. We are confident that the Board's hearing officers would not confuse the resolution of a disputed fact question with the obligation to impose, if warranted, appropriate conditions to aid in the individual's rehabilitation. Indeed, we doubt the effectiveness of imposing further limitations on an individual's liberty interests for rehabilitation purposes when those conditions emanate from a faulty, erroneous or unfair resolution of factual disputes. Permitting the individual to appear at a hearing with a member of the Bar lessens the likelihood of erroneous determinations and thereby enhances the effectiveness of any conditions imposed for the individual's rehabilitation.
For all these reasons, we respectfully reject our colleague's suggestion that only a "timely and colorable" denial triggers an individual's right to a hearing in this setting. We view this test as insufficient, unpredictable, and subject to the whim of the administrative body. Moreover, we observe that this test is more than the Board presently allows. The Board's failure to adopt or apply even this limited test for determining the need for a hearing in this case belies our colleague's conclusion that Jamgochian "received the process to which he was due." Post at 557, 928 A.2d 25.

D
Our decision is further compelled by considerations of fundamental fairness, which, in this State, reach further than the requirements of due process. See, e.g., Doe v. Poritz, supra, 142 N.J. at 108, 662 A.2d 367. This doctrine
serves to protect citizens generally against unjust and arbitrary governmental action, and specifically against governmental procedures that tend to operate arbitrarily. [It] serves, depending on the context, as an augmentation of existing constitutional protections or as an independent source of protection against state action.
[Ibid. (quoting State v. Ramseur, 106 N.J. 123, 377, 524 A.2d 188 (1987) (Handler, J., dissenting)).]
In Doe v. Poritz, supra, the Court held that convicted sex offenders have privacy interests in the information regarding their whereabouts and that, prior to being subjected to Megan's Law registration and notification requirements, those individuals were to be afforded the right to counsel, the right to a hearing and the right to judicial review as to their classification. 142 N.J. at 30-31, 106, 662 A.2d 367. The Court based that holding not only on the requirements of due process but also on *18 concepts of fundamental fairness. This holding further buttresses our conclusion that when the government seeks to infringe such a significant liberty interest, greater procedural rights than heretofore allowed by the Parole Board are due.

E
Lastly, we cannot overlook the fact that the curfew imposed was for an indefinite period of time. N.J.A.C. 10A:71-6.11 incorporates no mechanism by which an individual such as Jamgochian may seek the later modification or termination of a curfew. Just as Jamgochian will be subject to community supervision for the remainder of his life, so too  but for our judgment today  Jamgochian may be required, solely at the discretion of the Board, to abide by a curfew either from time to time, or permanently, for the remainder of his life.
In a later submission invited by our inquiry, the Board asserted, without reference to any written regulation, that "[p]ursuant to Division policy and procedure, when a curfew is imposed by a supervisor as a condition of [community supervision for life], it must be reviewed and assessed by a supervisor every six months to determine its efficacy and continued need." The Board has not indicated whether or to what extent an offender may participate in these periodic reviews, or what steps an offender may take if the Board fails to undertake such a review in any given case. We find such loose promises as to future review to be inconsistent with the requirements of due process and fundamental fairness.
An individual's liberty interests should not be held hostage to the whim or beneficence of the government. "[P]rocess which is a mere gesture is not due process." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 315, 70 S.Ct. 652, 657, 94 L.Ed. 865, 874 (1950). We are not convinced that absent today's judgment there is anything other than the unilateral action of the Board standing between Jamgochian and banishment to his home for eleven hours per day, every day, for the rest of his life. The constitutional principles we have already discussed require greater safeguards than are represented by the Board's bald assertion that it will consider the matter again sometime in the future. See also Hamdi v. Rumsfeld, supra, 542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578.
We thus conclude that the absence of a written procedure by which modification or termination of such an intrusive special condition may be sought by Jamgochian or others similarly situated violates the principles of due process and fundamental fairness.

V
In providing guidance for the Board's reconsideration of the process which is due Jamgochian, we commend for its consideration the procedures adopted in parole revocation matters. Although we acknowledge that the liberty interest at stake in this matter is not precisely the same, an individual serving a community supervision for life term is nevertheless to be "supervised as if on parole." State v. Williams, supra, 342 N.J.Super. at 92, 775 A.2d 727. And, when an individual who has been released from incarceration is subjected to a curfew  the breach of which constitutes a fourth-degree offense and possibility of incarceration  the liberty interests at stake must be understood as being far more similar to parole revocation, as in Morrissey, or revocation of an individual's participation in a "pre-parole" program, as in Young v. Harper, 520 U.S. 143, 152-53, 117 S.Ct. 1148, 1154, 137 L.Ed.2d 270, 280 (1997), than other less drastic limitations *19 on liberty, see, e.g., Meachum v. Fano, 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451, 461 (1976) (intrastate prison transfer); Shabazz v. Dep't of Corr., 385 N.J.Super. 117, 127, 896 A.2d 473 (App. Div.2006) (continued placement in a halfway house); O'Neal v. N.J. State Parole Bd., 149 N.J.Super. 174, 184, 373 A.2d 657 (App.Div.1977) (rescission of a parole date).
As explained by Chief Justice Burger in Morrissey, the individual who has been released on parole, like the individual who is released from incarceration and placed on community supervision for life,
can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. He may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation. The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions. . . .
We see, therefore, that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a "grievous loss" on the parolee and often on others. It is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a "right" or a "privilege." By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment. Its termination calls for some orderly process, however informal.
[Morrissey, supra, 408 U.S. at 482, 92 S.Ct. at 2600-01, 33 L.Ed.2d at 495 (footnotes omitted).]
These same circumstances are largely present here. Although, unlike Morrissey, the proceedings in question do not result in the direct or immediate re-incarceration of Jamgochian, nevertheless the curfew places a significant limitation on his liberty interests and a breach of the curfew would undoubtedly lead to incarceration. As a result, Morrissey's holding represents an influential paradigm for determining the procedural rights that should be afforded to Jamgochian and those similarly situated.
In considering the procedural rights that were constitutionally mandated in parole revocation matters in Morrissey, the Court held that upon threat of parole revocation, the federal due process clause required that a parolee be given at least "an informal hearing structured to assure that the finding of a parole violation will be based on verified facts and that the exercise of discretion will be informed by an accurate knowledge of the parolee's behavior." 408 U.S. at 484, 92 S.Ct. at 2602, 33 L.Ed.2d at 496. The Morrissey Court declined to "write a code of procedure," but it held that the "minimum requirements of due process" in that circumstance include "(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a `neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking *20 parole." Id. at 488-89, 92 S.Ct. at 2604, 33 L.Ed.2d at 498-99. The Court declined to reach the question of whether the parolee is entitled to the assistance of retained counsel or the appointment of counsel if indigent. Id. at 489, 92 S.Ct. at 2604, 33 L.Ed.2d at 499.
Regulations applicable to parole revocation proceedings in this State require all the rights described in Morrissey. And although Morrissey did not compel it, ibid., an individual facing parole revocation in this State also has the right to counsel. See N.J.A.C. 10A:71-7.7(c)(2).
We also suggest that the Board consider the trend, since Morrissey, to provide greater procedural rights in similar circumstances than were required by Morrissey. See, e.g., Dougherty v. N.J. State Parole Bd., 325 N.J.Super. 549, 740 A.2d 150 (App.Div.1999) (holding that the Parole Board was obligated to conduct a parole revocation hearing despite the parolee's refusal to participate and that it was not sufficient for the Board to simply postpone the hearing indefinitely until its scheduling was requested by the parolee), certif. denied, 163 N.J. 77, 747 A.2d 285 (2000); White v. N.J. State Parole Bd., 136 N.J.Super. 360, 368, 346 A.2d 415 (App. Div.1975) (holding that a criminal indictment alone was not a sufficient basis for parole revocation but only established reasonable cause for a parole revocation hearing); Johnson v. N.J. State Parole Bd., 131 N.J.Super. 513, 521, 330 A.2d 616 (App.Div.1974) (due process requires prompt probable cause and parole revocation hearings), certif. denied, 67 N.J. 94, 335 A.2d 47 (1975).
It is also of interest that the Supreme Court of the United States has held that the federal constitution guarantees a prison inmate facing disciplinary action greater procedural rights than afforded to Jamgochian here. Wolff, supra, 418 U.S. at 563-70, 94 S.Ct. at 2978-82, 41 L.Ed.2d at 955-59. Our courts have since determined that inmates are entitled to even greater procedural rights than compelled by Wolff. See McDonald, supra, 139 N.J. at 194-95, 652 A.2d 700; Avant, supra, 67 N.J. at 523, 341 A.2d 629; Decker, supra, 331 N.J.Super. at 356-59, 751 A.2d 1094.
The Board should also recognize that couching the nature of the proceedings that lead to the imposition of a curfew, such as occurred here, as "civil" instead of "criminal" does not provide any great insight into whether a person in Jamgochian's position has a right to counsel in the proceedings required by due process and fundamental fairness. Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 25, 101 S.Ct. 2153, 2158-59, 68 L.Ed.2d 640, 648 (1981); Pasqua v. Council, 186 N.J. 127, 142, 892 A.2d 663 (2006). For example, courts have held that the federal and state due process guarantees require that the right of counsel attaches: when the Megan's Law tier classification of a convicted sex offender is considered at a hearing, Doe v. Poritz, supra, 142 N.J. at 30-31, 662 A.2d 367; when a delinquent child support obligor faces enforcement proceedings pursuant to R. 1:10-3, Pasqua v. Council, supra, 186 N.J. at 141-46, 892 A.2d 663; when a person is charged with disorderly persons or other petty offenses in municipal court that may result in "actual imprisonment or . . . other serious consequences such as the substantial loss of driving privileges," Rodriguez v. Rosenblatt, 58 N.J. 281, 295, 277 A.2d 216 (1971) (emphasis added); when a parent is a party to civil proceedings that may lead to the temporary or permanent loss of parental rights, Crist v. N.J. Div. of Youth & Fam. Servs., 135 N.J.Super. 573, 575, 343 A.2d 815 (App.Div.1975); and when the involuntary civil commitment of a person is *21 sought, In re S.L., 94 N.J. 128, 136-37, 462 A.2d 1252 (1983).
This trend toward the enhancement of procedural rights in these settings should also be weighed in the Board's consideration of the procedures that now must be applied in the present and other similar circumstances.

VI
The Board's motion to dismiss the appeal as moot is denied, its decision imposing a curfew on Jamgochian is vacated and the matter remanded for further proceedings. We do not retain jurisdiction.
WEFING, P.J.A.D., dissenting.
My colleagues conclude that Ronald Jamgochian did not receive the due process to which he was entitled in connection with the imposition upon him of a curfew as part of the special conditions of the community supervision for life to which he was subject. My colleagues also conclude that the regulations governing the supervision of individuals who are subject to community supervision for life are deficient for failure to provide those persons with due process. N.J.A.C. 10A:71-6.11. Because I am unable to agree with these conclusions in the context of this matter, I dissent.
In 1998, appellant entered a negotiated plea of guilty to one count of second-degree sexual assault, N.J.S.A. 2C:14-2c(1), and one count of second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7, in return for concurrent terms of four years in prison. The record before us does not contain the transcript of the proceedings at which appellant was sentenced, and we are thus unable to account for the calculus which was used to balance the aggravating and mitigating factors to determine an appropriate sentence. We do know from the record before us that these convictions were not appellant's first contact with the criminal justice system. Appellant had at the time at least three prior convictions, two of which were for sexually-related offenses for which he received sentences of twelve years of incarceration.
By the time of his 1998 convictions, the Legislature had passed N.J.S.A. 2C:43-6.4, directing that any individual convicted of certain specified enumerated offenses, including N.J.S.A. 2C:14-2c(1), in addition to a period of incarceration, receive a special sentence of community supervision for life.[11] The statute provided in pertinent part:
The special sentence of community supervision required by this section shall commence upon completion of the sentence imposed pursuant to other applicable provisions of the Code of Criminal Justice. Persons serving a special sentence of community supervision shall be supervised as if on parole and subject to conditions appropriate to protect the public and foster rehabilitation.
Appellant was released from prison in 2001 and commenced his service of community supervision for life. Shortly thereafter, he filed a petition for post-conviction relief in which he alleged that he was not correctly informed at the time he entered his guilty plea that community supervision for life entailed restrictions upon his ability to travel outside the State. State v. Jamgochian, 363 N.J.Super. 220, 223, 832 A.2d 360 (App.Div.2003). The trial court denied relief without conducting an evidentiary hearing. Id. at 222, 832 A.2d 360. We reversed for an evidentiary hearing on *22 appellant's claim that he was misinformed about what community supervision for life entailed. Id. at 227, 832 A.2d 360. I infer from the existence of this present appeal that appellant did not prevail at that plenary hearing.
Following passage of N.J.S.A. 2C:43-6.4, the Department of Corrections adopted an implementing regulation, N.J.A.C. 10A:71-6.11. This regulation lists the twenty general conditions with which an offender must comply while under community supervision for life, including "comply[ing] with any curfew established by the assigned parole officer." N.J.A.C. 10A:71-6.11(b)(17).
In April 2005 the Hanover Police Department was contacted by Jane Doe, a teenage girl, with respect to a complaint of harassment. Jane Doe had worked as a waitress at a diner. She told the police that "Ron," a frequent customer, had been calling her persistently and had told her that he would pay her $300 a week for two hours work. "Ron" told her not to tell her employer. Jane Doe's mother learned that "Ron" had been calling her daughter and discussed the matter with Jane's employer, who told her that "Ron" had been in jail "for trouble with young girls." Because these conversations made Jane Doe uncomfortable, she contacted the police. The police conducted an investigation which led them to identify appellant as "Ron," and appellant's parole officer was notified.
Appellant's parole officer, and his supervisor, were immediately concerned. They perceived a similarity between appellant's alleged conduct with Jane Doe and the circumstances involved in his 1998 conviction for sexual assault, which they knew from appellant's file rested upon his having lured a woman with the opportunity to pose for photographs for a book jacket and then repeatedly assaulting her. Appellant's parole officer and his supervisor consulted with a deputy parole supervisor, and appellant was then served with an order directing him to have no contact with Jane Doe and imposing a curfew from 8:00 p.m. to 7:00 a.m.[12] In connection with the service of that order, a search of appellant's residence was conducted, which led to the discovery of a pornographic tape of appellant and a willing adult participant.
Two weeks later, appellant's attorney wrote to the New Jersey State Parole Board, protesting the imposition of these special conditions. In that letter, the attorney alleged that these conditions were the result of animus on the part of appellant's parole officer. Accompanying that letter was a certification from appellant detailing his complaints against his parole officer, which revolve around his expressed concern that the superintendent of the apartment building in which he was living had been in contact with the parole officer. Paragraphs 16 and 17 of the certification stated as follows:
16. P.O. Venditti then told me he had received orders from Trenton and that I had to sign these two papers. One said that I could not go near [Jane Doe] (and thereafter he verbally added the Diner) and the second was that I had a curfew.
17. I told him that this was all bullshit. That even if I made a call, what would that have to do with a curfew? I also told him that I would stay away from the Diner and I did not care about that.
On May 5, 2005, the Adult Panel, in response to appellant's appeal, adopted the recommendations of the District Parole Officer, including the curfew, the no-contact *23 order, and that appellant engage in counseling designed for sex offenders.[13]
My colleagues conclude that the procedure followed in this matter was deficient, in part, because "the record before the Adult Panel and the full Parole Board, consisted entirely of written materials, most if not all of which constituted hearsay." Ante, 394 N.J.Super. at 534, 928 A.2d at 11 (App.Div.2007). That, however, is one of the hallmarks of proceedings before the Parole Board, which "are dependent upon information obtained from various files, documents, records, and other materials and sources." Gerardo v. N.J. State Parole Bd., 221 N.J.Super. 442, 452, 534 A.2d 1037 (App.Div. 1987). Indeed, so dependent are Parole Board proceedings upon such material that we have specifically held that the residuum rule, otherwise applicable to administrative proceedings, does not apply to Parole Board decisions. Id. at 453, 534 A.2d 1037. We reached this conclusion, noting the
legislative awareness and acceptance of the fact that, of necessity, evidence at parole hearings is frequently hearsay by nature. This is so because the Board's parole decisions are often highly predictive and subjective.
[Id. at 452, 534 A.2d 1037.]
My colleagues also conclude that the Parole Board proceedings in this matter were defective because appellant was not afforded the opportunity for confrontation and cross-examination. In my judgment, the right of confrontation and cross-examination should not be viewed as a necessary and integral part of all proceedings in which the Parole Board is considering the imposition of conditions as part of community supervision for life. I note initially that the parole proceedings are not part of a criminal prosecution and that the full panoply of rights associated with the process due a defendant charged with a criminal offense do not come to bear in parole proceedings. Gagnon v. Scarpelli, 411 U.S. 778, 788-89, 93 S.Ct. 1756, 1763, 36 L.Ed.2d 656, 665 (1973) (noting "there are critical differences between criminal trials and probation or parole revocation hearings, and both society and the probationer or parolee have stakes in preserving these differences"); Gerardo v. N.J. State Parole Board, supra, 221 N.J.Super. at 448, 534 A.2d 1037. This is so because the essential focus of parole proceedings is rehabilitative, not punitive. Gagnon v. Scarpelli, supra, 411 U.S. at 785, 93 S.Ct. at 1761, 36 L.Ed.2d at 663.
My colleagues draw an analogy to prison disciplinary proceedings, in which, in appropriate instances, an inmate may confront and cross-examine a corrections officer who has filed charges against the inmate. Ante at 536, n. 3, 928 A.2d 12. Decker v. N.J. Dep't of Corrections, 331 N.J.Super. 353, 751 A.2d 1094 (App.Div. 2000). In my judgment, Decker is distinguishable from the present matter and supplies no basis to conclude that appellant's *24 due process rights were trampled. In that case, inmate Decker was charged with tampering with or blocking a locking device in violation of N.J.A.C. 10A:4-4.1(a)*.154 and the hearing officer concluded that Decker's "intentional act jeopardized the security of the facility." Id. at 355, 751 A.2d 1094. Decker testified at the disciplinary hearing that he was pushed into the gate by the press of inmates leaving the mess hall, and he submitted statements of two other inmates corroborating his version of what occurred. We concluded that since the case "turn[ed] on whether the complaining officer [was] correct or incorrect in charging an inmate with conduct that was intentional. . . . the inmate [was] entitled to challenge the officer's perceptions by developing why the officer thought the incident was purposeful as opposed to accidental." Id. at 359, 751 A.2d 1094.
Here, however, my review of the record and the various submissions by appellant and his attorney to the parole authorities does not disclose any statements by appellant that in my judgment could fairly be characterized as a denial of the allegations made by Jane Doe. My colleagues treat appellant's use of an expletive as a denial. In my judgment, the context requires the conclusion that appellant was referring to the curfew, not the charges. I do not consider it unfair to expect appellant to set forth an explicit denial of the charges as opposed to what is, at best, an ambiguous emotional reaction. In the absence of such a denial, I am unwilling to conclude that these proceedings, and the regulations under which they were held, were deficient.
In connection with this aspect of their decision, my colleagues write that appellant "accused his parole officer of misconduct which affected, in his view, the decision to impose a curfew." Ante at 536-37, n. 3, 928 A.2d 12. In my judgment, a balanced reading of appellant's certification of April 25, 2005, would not support a conclusion that his parole officer had a vendetta against appellant or perceived his role to be that of Inspector Javert pursuing Jean Valjean. Appellant's landlord may have expressed complaints against him, but nothing within that certification would support an inference that the landlord's bias infected appellant's parole officer.
I would utilize the case-by-case approach this court earlier adopted when deciding whether indigent parolees were entitled to the assignment of counsel when charged with violations of parole. Bolyard v. Berman, 274 N.J.Super. 565, 577, 644 A.2d 1122 (App.Div.), certif. denied, 138 N.J. 272, 649 A.2d 1291 (1994). There, we relied upon the principles set forth by the United States Supreme Court in Gagnon v. Scarpelli, supra, which conditioned the right to counsel in such cases upon the probationer or parolee presenting
a timely and colorable claim (i) that he has not committed the alleged violation of the conditions . . .; or (ii) that, even if the violation is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation.
[Bolyard, supra, 274 N.J.Super. at 574, 644 A.2d 1122 (quoting Gagnon, supra, 411 U.S. at 790, 93 S.Ct. at 1764, 36 L.Ed.2d at 666-67).]
In my judgment, appellant has yet to make a "timely and colorable claim" in either respect. Because in my view claims of entitlement to a hearing are susceptible to such a case-by-case approval, I would not direct promulgation of new regulations to supersede N.J.A.C. 10A:71-6.11.
*25 Further, I am troubled by the lack of definition to my colleagues' assertion that appellant was entitled to confront and cross-examine witnesses in connection with the decision to impose a curfew upon him. My colleagues do not address who it is that appellant may have the right to cross-examine. Is it the police officers who took Jane Doe's complaint? Is it the parole personnel who were alerted by the police? Or is it Jane Doe herself? Compelling her to appear for cross-examination poses, in my mind, a significant "danger that the hearing body would be less attuned to the parolee's rehabilitation needs because it would be distracted by the adversarial nature of the proceedings." Bolyard, supra, 274 N.J.Super. at 573-74, 644 A.2d 1122.
Further, my colleagues, in setting forth the proposition that "a trend toward the enhancement of procedural rights," ante at 550, 928 A.2d 21 should guide the Board in its determination of how to structure such hearing point to Rodriguez v. Rosenblatt, 58 N.J. 281, 277 A.2d 216 (1971). The Supreme Court, however, in Beckworth v. N.J. State Parole Bd., 62 N.J. 348, 365-66, 301 A.2d 727 (1973), specifically declined to consider Rodriguez as bearing upon the appropriate conduct of parole hearings.
In my judgment, appellant received the process to which he was due, and I would thus affirm the action of the Parole board.
NOTES
[1] The record does not include the transcript of the plea proceedings or anything other than this pre-sentence report, which would reveal the conduct that formed the basis for Jamgochian's conviction. We assume, for present purposes, the accuracy of the factual recitation contained in the pre-sentence report.
[2] Other conditions were also then imposed, including a prohibition on Jamgochian having any contact "what so ever [sic], physical, verbal, written or through a third party" with Jane Doe. Jamgochian does not seek our review of the imposition of any of these special conditions.
[3] In this vein, we find it incongruous that an inmate, charged with violating a prison regulation, possesses a right to confront and cross-examine witnesses absent only a reasoned determination by an impartial tribunal that cross-examination is not necessary for an adequate presentation of the evidence, or in the interest of prison security, see Avant v. Clifford, 67 N.J. 496, 532, 341 A.2d 629 (1975), whereas the same rights were denied Jamgochian here. We also recently emphasized the importance of preserving an inmate right's to confrontation and cross-examination when a matter turns on the credibility of the inmate and a corrections officer. In Decker v. Dep't of Corr., 331 N.J.Super. 353, 359, 751 A.2d 1094 (App.Div.2000), we held that "where the inmate is charged with a disciplinary infraction by virtue of conduct directed to or at a corrections officer and the matter turns on the credibility of the officer or the inmate, the inmate, upon request, is entitled to confrontation and cross-examination of the officer, at least in the absence of issues that justify an exception as a matter of prison security." By comparison, Jamgochian accused his parole officer of misconduct, which affected, in his view, the decision to impose a curfew; the Board, however, as indicated earlier, did not consider or pursue this allegation and gave Jamgochian no opportunity to provide evidence in support of his claim. If this matter had arisen in a prison setting, Jamgochian would have been entitled to greater procedural rights than afforded here. See McDonald v. Pinchak, 139 N.J. 188, 194-95, 652 A.2d 700 (1995); Avant, supra, 67 N.J. at 523, 341 A.2d 629; see also Wolff v. McDonnell, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935, 951 (1974).
[4] We recognize that Jamgochian did submit factual and legal written arguments to the Parole Board both before and after the Adult Panel's decision. This fact does not alter our view that Jamgochian was deprived of due process in this matter. Indeed, there is nothing in the Board Chairman's letter of May 5, 2005, which explained the reasons for the Adult Panel's decision, thus belying any contention that anything Jamgochian had asserted in his attorney's submission had actually been considered by the Adult Panel. Indeed, as we have mentioned, Jamgochian's factual and legal contentions regarding the alleged misconduct of the parole officer were merely passed along to the Division of Parole. The full Parole Board also did not consider any of Jamgochian's other factual contentions and further rejected his due process arguments by mere reference to N.J.A.C. 10A:71-6.11(l). We decline to hold that by submitting unsolicited materials to the Parole Board, of which the Board was dismissive, Jamgochian's due process rights were adhered to.
[5] We are also perplexed by the absence of any argument regarding whether the Legislature has already fixed the procedural rights due. That is, N.J.S.A. 2C:43-6.4(b) states that persons serving a special sentence of community supervision for life, among other things, "shall be subject to the provisions and conditions set forth in . . . sections 15 through 19 and 21 of P.L. 1979, c. 441." These incorporated provisions include N.J.S.A. 30:4-123.62 and -123.63 (i.e., sections 18 and 19 of P.L. 1979, c. 441), which outline the rights due to a parolee, including those rights recognized by Morrissey and the additional right to counsel. It is conceivable that by expressly incorporating N.J.S.A. 30:4-123.62 and -123.63 as provisions applicable to community supervision for life terms, the Legislature intended that the procedural rights contained in N.J.S.A. 30:4-123.62 and -123-63 would be applicable to the imposition of a special condition. Because this issue has not been briefed, however, we offer no view on the impact N.J.S.A. 30:4-123.62 and -123.63 may have on the issues on appeal. The parties are free to raise this issue, in this first instance, on remand.
[6] We are not persuaded that "the timely and colorable" test we adopted in Bolyard, supra, 274 N.J.Super. at 574, 644 A.2d 1122, for determining when an indigent parolee charged with a parole violation is entitled to the appointment of counsel should be transplanted and utilized here to create a case-by-case approach for determining when someone in Jamgochian's position is entitled to a hearing.
[7] We would also question whether it is fair to determine whether Jamgochian fully disputed Jane Doe's allegations when there is nothing in the record to suggest that at the time of Jamgochian's submission he had been provided with a copy of Jane Doe's statement.
[8] Our colleague is also dismissive of Jamgochian's allegations that his parole officer had a vendetta against him, stating that these allegations do not suggest that the parole officer was pursuing Jamgochian as Inspector Javert pursued Jean Valjean in Les Misérables. Post at 556, 928 A.2d 24. In questioning the motives of the parole officer  and thereby questioning the credibility of his accusations  we do not think that Jamgochian should be put to the test of demonstrating that the parole officer fit the Javert mold of overzealousness.
[9] The Attorney General has advised that the Board conducts probable cause, final revocation and rescission hearings at the rate of forty per week.
[10] See Trantino v. N.J. State Parole Bd., 166 N.J. 113, 172-73, 764 A.2d 940 (2001); In re Hawley, 98 N.J. 108, 112-13, 484 A.2d 684 (1984); Hare v. N.J. State Parole Board, 368 N.J.Super. 175, 179-80, 845 A.2d 684 (App. Div.), certif. denied, 180 N.J. 452, 852 A.2d 189 (2004); N.J. State Parole Board v. Cestari, 224 N.J.Super. 534, 547-48, 540 A.2d 1334 (App.Div.), certif. denied, 111 N.J. 649, 546 A.2d 558 (1988); but see, Pazden v. N.J. State Parole Bd., 374 N.J.Super. 356, 370, 864 A.2d 1136 (App.Div.2005) (applying a more strict standard of appellate scrutiny of the imposition of a vague condition following a parolee's release).
[11] The statute has since been amended to provide for "parole supervision for life." L. 2003, c. 267, § 1, effective January 14, 2004.
[12] Special conditions such as imposition of this curfew are not effective until "affirmed by the appropriate Board panel." N.J.A.C. 10A:71-6.11(1)(4).
[13] My colleagues appear to attach some significance to the fact that the justification stated in the May 23, 2005 Special Condition for the curfew differs from the language used in the April 15, 2005 Special Condition originally drafted by the parole officer. There is, however, no difference in the language used in the May 5, 2005 and May 23, 2005 documents. The specific references to appellant's conduct with regard to Jane Doe which my colleagues say was dropped from the May 23 Special Condition remain in the Special Condition imposing the no-contact order. I consider it self-evident that those factual allegations are the underpinning for the curfew order, and thus I disagree with my colleagues' description of the May 23, 2005, Special Condition imposing the curfew as "conclusory."